Thomas Wesley HOVIS, Jr., Appellant,

v.

STATE of Indiana, Appellee.

No. 1282S484.

Supreme Court of Indiana.

Oct. 31, 1983.

John F. Surbeck, Jr., Trotter & Surbeck, Fort Wayne, Paul L. Perito, Robert Plotkin, Jean E. Williams, Perito, Duerk, Carlson & Pinco, P.C., Washington, D.C., for appellant.

Linley E. Pearson, Atty. Gen., John D. Shuman, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Chief Justice.

Appellant was charged by information with Murder and Felony Murder. He was tried before a jury and found ·guilty of Murder. He was sentenced to a fifty (50) year term of imprisonment.

The facts are: Thomas Hardy testified that at about 3:00 A.M., on February 2, 1980, he was awakened by sounds of a "commotion" outside his home in Fort Wayne. He saw two men "hunched over" a third man who was on the ground. The man on the ground was eventually identified as the decedent, one John Faurote, a cab driver. A taxi cab with the passenger door open was parked on the street. Hardy ran outside grabbing a stick off his porch. He then called out to the men to stop, whereupon one of them fled. He identified this man as Duane Mason with whom he was acquainted. The other man began to move toward him, whereupon he swung at him with the stick he was carrying, striking him in either the head or the hand. He described this assailant as a caucasian with light colored hair. However, when asked if he could identify anyone in the courtroom as the assailant, he stated he could not. Hardy's attention was called to appellant specifically by appellant's attorney on cross-examination. Hardy testified appellant's features did not match "the picture I had in my mind [of the assailant.]" He concluded his testimony by stating he didn't think appellant was the man he confronted on the night of the crime.

State's witness Terry Becker testified he was the owner of a bar in Fort Wayne. He stated that around 2:00 A.M. on February 2, 1980, appellant and another man came into his bar and stayed for about an hour. He heard appellant telephone "the cab company" to get a ride home. The pair left the bar in a cab driven by a male. He could not identify the driver nor say which cab company was called.

State's witness Yvonne Swangim testified she was casually acquainted. with appellant. Around 4:00 A.M., on February 2, 1980, appellant came to her house and stayed until sometime the next day. Appel-

lant told her he and Duane Mason had been in a fight and that his hand hurt where he had been ,struck with a board during the fight.

■ We do not reweigh the evidence nor judge the credibility of witnesses. *Wells v. State,* (1982) Ind., 441 N.E.2d 458. Where the evidence is circumstantial, the conviction is affirmed where reasonable inferences may be drawn to support the jury's findings. *Wells, supra.*

Appellant claims there is not substantial evidence to identify him as the perpetrator of the offense.

■ The inability of an eyewitness to the crime to identify the defendant in court as the perpetrator of the offense is not dispositive of the question of sufficiency of the evidence that the defendant is the perpetrator of the crime. *See, e.g., Dillon v. State,* (1983) Ind., 448 N.E.2d 21. It is for the jury to resolve conflicts in the testimony and to weigh the evidence. *Logsdon v. State,* (1980) Ind., 413 N.E.2d 249; *Hauger v. State,* (1980) Ind., 405 N.E.2d 526. The key question in this case is whether from all the evidence the jury could have drawn a reasonable inference that appellant was the perpetrator of the crime. *See Dillon, supra.*

We believe such an inference is reasonable. From the evidence above recited, the jury could have reasonably inferred appellant was the assailant whom Hardy confronted and who was beating the decedent.

Appellant also argues there is insufficient evidence of the required intent to kill another human being so as to sustain a conviction for murder under I.C. § 35–42–1–1(1) [Burns 1979]. The intent element of murder may be shown by evidence that the perpetrator engaged in conduct while aware of a high probability death would occur as a result. *See Bryan v. State,* (1983) Ind., 450 N.E.2d 53. In the case at bar the pathologist who performed an autopsy on the decedent testified he died as a result of suffocation in his own blood. The decedent's son testified he visited his father in the hospital before he died and that he

had been beaten "very badly" and that his face "was just a total mess." This is sufficient evidence from which the jury could infer awareness on appellant's part that death would result from the conduct in which he was engaged. *See Bryan, supra.*

We hold the evidence is sufficient to support appellant's conviction for murder under I.C. § 35–42–1–1(1).

■ Appellant claims the trial court erred when the State called Duane Mason as a witness. When the judge asked Mason to take the oath after he was called, Mason stated that he would not testify in appellant's trial. The judge inquired if he knew he could be held in contempt for refusing to do so, and Mason said he understood that. We note the record indicates Mason had been tried for and convicted of Faurote's murder earlier. Then Mason reiterated that under no circumstance would he testify in appellant's trial. The judge then sentenced Mason to ninety (90) days imprisonment for direct contempt. All this occurred in the presence of the jury.

Following Mason's removal from the courtroom, the judge admonished the jury to disregard what they had seen and to draw no inferences, favorable or unfavorable, on behalf of either the defendant or the State, based upon what they had seen. However, at the conclusion of the trial he refused to give an instruction containing the same admonishment to the jury.

Appellant claims the trial court erred on grounds the total effect of these events was to deny him the Sixth Amendment right to confront and cross-examine a witness.

Appellant first cites *Douglas v. Alabama,* (1965) 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 in support of his argument. In that case the defendant Douglas's alleged accomplice, one Loyd, was called by the State as a witness at Douglas's trial. Loyd had already been tried for and convicted of the offense. Loyd took an oath but then refused to answer all questions put to him, invoking his Fifth Amendment privilege. The prosecution then proceeded to read a statement allegedly made by Loyd in which he incriminated Douglas, pausing every few sentences to ask him if he had made such a statement. Loyd refused to answer each such question. Eventually the entire statement was read to the jury in this matter.

The Supreme Court held this procedure violated the defendant's confrontation rights. However, contrary to appellant's claim in his brief, the Court did not identify the jury's witnessing of Loyd's refusal to testify as the error requiring reversal. Rather, the error was in permitting Loyd's alleged statement to be read in the presence of the jury without permitting Douglas to cross-examine Loyd. The Court stated: "[Douglas's] inability to cross-examine Loyd *as to the alleged confession* plainly denied him the right of cross-examination secured by the Confrontation Clause." (Emphasis added.) *Id.* at 419, 85 S.Ct. at 1077, 13 L.Ed.2d at 937.

A case decided by this Court, *Aubrey v. State,* (1974) 261 Ind. 692, 310 N.E.2d 556, is also cited in support of appellant's argument. In that case, the witness, an alleged accomplice of the defendant, was called to testify but asserted his Fifth Amendment right after answering a few preliminary questions. The jury was excused while an immunity hearing was held at which the accomplice-witness was granted immunity. However, when the jury returned and the State reasked the witness the questions he had previously refused to answer, he again refused to answer and was cited for contempt. The defendant asked for an admonishment that the jury disregard what they had seen, which the judge refused to give.

We stated:

"The record discloses that the State was aware before trial that this witness would refuse to testify. The natural, even inevitable, inference which is raised in the jury's mind when *an alleged accomplice refuses to testify* is that the withheld testimony would be damaging, not only to the witness, but also to the defendant. Thus, the mere refusal to speak indelibly implants adverse inferences in the minds of the jurors and reaches them in a form not subject to cross-examination. Blake's

refusal to testify 'may well have been the equivalent in the jury's mind of testimony.' *Douglas v. Alabama* (1965) 380 U.S. 415, 419, 85 S.Ct. 1074, 1077 [13 L.Ed.2d 934]." (Emphasis in original.) *Aubrey, supra,* at 695–96, 310 N.E.2d at 559.

We reversed, holding the refusal to give the requested admonishment was error.

Appellant seizes upon the language quoted above from the *Aubrey* case claiming the refusal to testify "may well have been the equivalent in the jury's mind of testimony" and asserts his right of confrontation was thus denied because of his inability to cross-examine the accomplice, Mason, who "testified" by invoking the Fifth Amendment privilege. He also cites a recent case, *Pitman v. State,* (1982) Ind., 436 N.E.2d 74, for the proposition that the proper procedure to be followed in the event the jury witnesses the invocation of the Fifth Amendment by an alleged accomplice is to both give an admonishment and an instruction to the jury to disregard what they have seen.

We conclude in this case the admonishment was sufficient to cure any prejudice possibly accruing to appellant as a result of the jury's having viewed Mason's invocation of the Fifth Amendment. The admonishment was given promptly and was thorough in its direction to the jury. Reversal in *Aubrey, supra,* was required because of the failure of the trial judge to give an admonishment to the jury to disregard what they had seen. In *Pitman, supra,* we did not hold both an admonishment and an instruction were required to avoid reversible error in this situation. We hold the trial court did not err in its handling of the matter of Mason's refusal to testify.

Appellant claims the trial court erred in not ordering a new trial due to the State's failure to disclose exculpatory evidence that was properly requested via a pre-trial discovery order. *See generally Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. In *United States v. Agurs,* (1976) 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342, the United States Supreme Court expanded upon the general principle announced in the *Brady* case that due process

requires disclosure by the prosecution of exculpatory evidence upon request by the defendant. In *Agurs, supra,* the Court categorized cases in which a claim of nondisclosure is made into three groups: (1) cases in which the undisclosed evidence would show part of the State's proof was perjured testimony; (2) cases in which the State failed to disclose specifically requested items; and (3) cases in which the State failed to disclose items in the face of only a general request for exculpatory evidence by the defendant, or no request at all.

In *Richard v. State,* (1978) 269 Ind. 607, 612–14, 382 N.E.2d 899, 903–4, we summarized the principles of law to be applied in analyzing the last two kinds of cases:

"The second type of case in which the prosecutorial duty of disclosure comes into question is characterized by a pre-trial request by the defense for specific evidence.

   *      *      *      *      *      *

"When such a request has been made, and requested evidence favorable to the accused is suppressed, a medium level of review is applied: the conviction will be reversed if the evidence 'might have affected the outcome of the trial.' *Agurs, supra,* 427 U.S. at 104, 96 S.Ct. at 2398, 49 L.Ed.2d at 350.

   *      *      *      *      *      *

"Thus, in order to invoke this level of review, the defendant must show that his pre-trial request, 'gave the prosecutor notice of exactly what the defense desired.' *Agurs, supra,* 427 U.S. at 106, 96 S.Ct. at 2398–99, 49 L.Ed.2d at 351.

"The third class of cases discussed by *Agurs* arise [sic] when there has been either a general request for discovery, or no request at all.

   *      *      *      *      *      *

"[In such cases] the least stringent review standard under *Agurs* applies. This standard for *Agurs* 'type III' cases is that the omitted evidence, as evaluated in the context of the entire record,' must create 'a reasonable doubt that did not otherwise exist ....' *Agurs, supra,* 427 U.S. at

112–13, 96 S.Ct. at 2401–2, 49 L.Ed.2d at 355."

In the case at bar, appellant first claims the prosecutor withheld information that State's witness Yvonne Swangim had a criminal record, namely, a conviction, for possession of cocaine, for which she had received a suspended sentence and probation.

The State was ordered to disclose, *inter alia:*

"5. Any record of prior criminal convictions which may be used for impeachment of persons whom the State intends to call as witnesses ...."

However, appellant fails to prevail on his claim because the record shows there was compliance with the order as it relates to witness Swangim. In a hearing out of the presence of the jury conducted before Swangim took the witness stand, appellant's counsel admitted that he had been provided with a copy of Swangim's "rap sheet." Though the prosecutor's statements during this colloquy amount to admission the compliance with the discovery order in this regard was tardy, it does not amount to a showing of no compliance at all. Appellant's attorney nevertheless requested that due to the State's tardy compliance with the discovery order the trial judge impose the sanction of refusing to permit Ms. Swangim to testify at all.

██ We have frequently held that the usual remedy for failure to comply with a discovery order, when the defendant is surprised by testimony from an undisclosed witness or discovers undisclosed evidence relating to a witness' testimony while that witness is on the witness stand, is to move for a continuance. Exclusion of the witness' testimony is necessary only where the failure to comply with the discovery order is grossly misleading or demonstrates bad faith on the part of the prosecutor. *See, e.g., Riley v. State,* (1982) Ind., 432 N.E.2d 15; *Osborne v. State,* (1981) Ind., 426 N.E.2d 20; *O'Conner v. State,* (1980) 272 Ind. 460, 399 N.E.2d 364. In the case at bar appellant did not move for a continuance. We hold the trial court did not err in re-fusing to bar Ms. Swangim from testifying due to the State's tardy disclosure of her criminal record.

██ Appellant claims the prosecutor failed to disclose a pretrial statement by Maria Hardy, wife of State's witness Thomas Hardy. He claims that prior to trial Maria Hardy made a statement in which she stated she got a look at the decedent's assailants from her bedroom window when her husband went outside to investigate the noises they had heard. It is further claimed that in the statement Mrs. Hardy said, as did her husband in testifying at trial, that appellant did not look like the man she saw briefly confronting her husband on the street. Appellant claims had the existence of this statement been made known to him prior to trial, he could have had Mrs. Hardy testify that appellant was not the perpetrator of the crime, and under the test of *Agurs, supra,* the suppressed evidence "might have affected the outcome of the trial," and therefore reversal is required. It is also claimed that at this time the State has still refused to disclose the statement.

The evidence necessary for us to resolve this issue is in the form of an affidavit attached to the Motion to Correct Error. *See* Ind.R.Tr.P. 59(H)(1). This affidavit is a transcript of an interview conducted in appellant's attorney's office between the attorney and Mr. and Mrs. Hardy. It shows that the day before trial Mr. Hardy was called to the prosecutor's office and was handed transcribed statements taken previously from both him and his wife. Mr. Hardy stated he did not know his wife ever gave such a statement. Mrs. Hardy stated she gave a statement to a Mr. Decker, whom the attorney stated was an investigator in the Public Defender's office. The attorney's statements and Mrs. Hardy's answers clearly indicate, that as they were discussing Mrs. Hardy's statement, the attorney held a copy of the statement in his hand. However, neither the statement itself, nor a copy of it, nor even a sworn statement as to its contents, are attached to the Motion to Correct Error. In no part of

the interview is there any recitation by anyone that indicates what the content of the statement was. Only in appellant's brief is there any claim Mrs. Hardy's statement is that appellant is the "wrong man." The Hardys' various statements indicate it was not until after appellant's trial that Mrs. Hardy first learned what appellant looked like, when her husband showed her a picture of appellant he had obtained from appellant's parents.

Mrs. Hardy gave this statement to an investigator from the Public Defender's office. Thus, the statement was not one made pursuant to an interview by the State. Though one of Mrs. Hardy's affirmations is that at one time she talked to a policeman, she also stated she was not "interviewed as a witness" by the State. We conclude the prosecutor was obligated, at most, to provide her name and address to the defendant but not to disclose to the defendant this particular statement as a specifically requested item. The discovery order goes only to statements made pursuant to State initiated discussions with potential witnesses. The statement was the result of an interview of Mrs. Hardy by an agent of the defendant.

The jury found appellant to be the perpetrator of the offenses beyond a reasonable doubt based on circumstantial evidence. The jury was not dissuaded from this finding despite Thomas Hardy's testimony that appellant was not the assailant he confronted in the street. We fail to see how it could be said testimony from Mrs. Hardy to the same effect as that of her husband would have created a reasonable doubt as to the assailant's identity. The facts adduced show she could not likely have gotten as good a look at the assailant as did her husband, who came close enough to the assailant to strike him with a stick. If Mr. Hardy's testimony that appellant was not the man he confronted did not create a reasonable doubt as to appellant's identity, cumulative testimony from Mrs. Hardy to the same effect but premised on a less adequate factual basis would not likely have done so either. Cumulative testimony omitted from presentation due to prosecutorial suppression is ordinarily held insufficient to meet the "reasonable doubt that would otherwise not exist" test. *Richard, supra.*

Appellant's claim fails for another and even more fundamental reason, however, due to his failure to provide us with the contents of the statement. Under *Agurs, supra,* and its progeny, suppression of evidence by the State results in reversal only where the evidence suppressed is exculpatory. Without any evidence before us as to the contents of the statement that would enable us to say it is "exculpatory" to some degree or another, we cannot reverse. Appellant has failed to carry his burden of presenting a record to substantiate his claim of error on this issue. *See, e.g., Spears v. State,* (1980) 272 Ind. 634, 401 N.E.2d 331.

Appellant claims he cannot include the statement in the record because the State continues to refuse to let him have it, or even a copy of it. But as we have noted, the interview of the Hardys, conducted in the office of appellant's attorney before the Motion to Correct Error was filed, unequivocally indicates that by that time the attorney had somehow acquired a copy of the statement. There are several ways for the contents of the statement to be presented to us without acquiring the original statement or a memorandum made as a result of the interview with Mrs. Hardy. *See* Ind.R. Tr.P. 59(A)(1).

It is extremely unlikely the statement would be exculpatory in the manner now suggested by appellant, that it would show Mrs. Hardy entertained doubts about whether appellant was the assailant she saw on the street on the night in question. In the affidavit, Mrs. Hardy stated she had no knowledge of appellant's appearance until after the trial when her husband obtained and showed her a picture of appellant. She then decided the picture did not depict the assailant she saw. However, the allegedly suppressed exculpatory statement was given by her long before trial, *i.e.,* long before Mrs. Hardy had ever seen appellant

or his picture. It is difficult to imagine how she could have said anything in her statement on September 9, 1980, to the effect that the wrong man was being prosecuted for the crime, when she did not know what the man being prosecuted looked like until May, 1982.

We hold appellant is not entitled to a new trial on grounds the prosecutor suppressed exculpatory evidence in violation of the trial court's pretrial discovery order.

■ Appellant claims he is entitled to a new trial on account of "the prosecution's continued pattern of misconduct." In addition to the above, other claims of prosecutorial misconduct are based on the asking of five questions of witnesses by the State, appellant's objections to each being sustained; introduction of an autopsy photograph of the decedent during the taking of testimony from the decedent's son; introduction of mug shots of appellant that implied he had a prior criminal record; and improper reference to evidence during final argument.

The basic test for determining whether a defendant is entitled to a new trial on account of prosecutorial misconduct is set forth in *Maldonado v. State,* (1976) 265 Ind. 492, 498–99, 355 N.E.2d 843, 848:

"1. The Court first determines that the prosecutor in fact engaged in misconduct. This determination is made by reference to the case law and the disciplinary rules of the Code of Professional Responsibility as adopted in this State. *See Swope v. State,* (1975) 263 Ind. 148, 325 N.E.2d 193.

"2. The Court then considers whether the misconduct, under all the circumstances, 'placed [the defendant] in a position of grave peril to which he should not have been subjected.' (Cites omitted.) "The 'grave peril' standard does not require the Court to find that the misconduct determined the outcome of the trial. *White, supra* [257 Ind. 64], at 272 N.E.2d [312] 319–320. This is the same standard which *White* mandates trial courts to observe in ruling on mistrial motions.

"3. Whether the misconduct results in subjecting the defendant to 'grave peril' is determined by the probable persuasive effect of the misconduct on the jury's decision, not by the degree of impropriety of the conduct. *Swope v. State, supra.*

"4. Even if an isolated instance of misconduct does not establish grave peril, if repeated instances evidence a deliberate attempt to improperly prejudice the defendant, a reversal may still result."

As to the five questions asked by the prosecutor of various witnesses resulting in objections by appellant, all of which were sustained, we find none were capable of having had any persuasive effect on the jury's decision. These questions demonstrate a certain unfamiliarity with the rules of evidence but fall short of a deliberate attempt to place inflammatory and prejudicial information before the jury.

■ As to the introduction of the photograph of the body of the deceased and the eliciting of testimony from his son that the photograph depicted the body of his father, we find no misconduct at all. It is well-known the introduction of photographs as evidence is proper if they depict objects or scenes a witness would be permitted to describe verbally. *Askew v. State,* (1982) Ind., 439 N.E.2d 1350; *Hopkins v. State,* (1981) Ind., 429 N.E.2d 631. The photograph of the decedent depicting his injuries merely corroborated the testimony of Steven Faurote as to the injuries he observed his father had suffered. Faurote's testimony was, in turn, relevant as evidence of the extent of injuries suffered by the victim of a homicide. *See, e.g., Hopkins, supra; Akins v. State,* (1981) Ind., 429 N.E.2d 232.

As to the prosecutor's use of mug shots of appellant, the first such instance occurred during the testimony of Terry Becker, the bar owner who identified appellant as the man who had been in his bar earlier in the morning in question. A mug shot of appellant was shown to Becker, and he was asked if it was the same photograph he had selected from an array shown to him by police. Becker replied that the photograph shown him at trial was the same one he had selected earlier, whereupon it was admitted into

evidence and shown to the jury. The second mug shot of appellant was admitted into evidence during testimony of the Fort Wayne police officer who went to Florida to pick appellant up nine months after the murder.

■ Appellant relies on the general rule that mug shots of defendants are inadmissible as evidence, the reason being they imply prior criminal activity on the part of the accused. *See, e.g., Miller v. State,* (1982) Ind., 436 N.E.2d 1113; *Richey v. State,* (1981) Ind., 426 N.E.2d 389; *Gray v. State,* (1978) 268 Ind. 177, 374 N.E.2d 518. Such photographs are admissible, however, if they are not unduly prejudicial and if they have substantial independent probative value. *Id.*

■ In light of the above rules, and remembering we are analyzing the problem in the context of a prosecutorial misconduct argument, we find no misconduct requiring reversal. First, the key issue of fact in the case was the identification of appellant as the assailant and as the man Thomas Hardy confronted in the street on the night in question. The mug shot of appellant admitted during the testimony of witness Becker served the purpose of enabling the jury to compare how appellant looked at some time in the past to his in-court appearance in order to enable them to further resolve the overall issue of the identity of the assailant and to help explain the inability of Hardy to identify appellant in court as the man he saw. Thus, the photograph had substantial independent probative value with regard to the issue of identification of appellant as the perpetrator of the offense. *See Richey, supra; Gray, supra.*

■ As to the question of whether the admission of the photograph was unduly prejudicial notwithstanding its substantial independent probative value, we note with disapproval the State made no attempt to disguise the fact this photograph was a mug shot. It is quite apparent it would have been easy to do so in this case with a snip of the scissors. This is something that should be done to mug shots before they are used at trial, even where the photograph has substantial independent probative value. *See Gray, supra.*

In conclusion, however, we observe appellant's objection to admission of the photograph at trial was only that it should not be admitted because appellant had not been provided with the photograph prior to trial pursuant to the discovery order. To now permit him to gain a reversal on the grounds of prosecutorial misconduct, which is, in turn, premised on those rules of law applying to admission of mug shots as evidence, would effectively permit him to escape the rule that an argument on appeal must be premised on the same grounds as was the required in trial objection. *See Coffee v. State,* (1981) Ind., 426 N.E.2d 1318; *Phelan v. State,* (1980) Ind., 406 N.E.2d 237.

■ As to admission of the second mug shot, there is no basis at all for holding the prosecutor committed misconduct in offering it as evidence. The record shows the jury was informed the photograph was taken pursuant to appellant's arrest for the instant offense. Thus, it did not imply prior criminal activity on appellant's part at all. The prosecutor committed no misconduct in offering it as evidence. *See Richey, supra.*

■ Appellant claims the prosecutor improperly referred in final argument to evidence regarding threats made by telephone to witness Swangim. Appellant objected to the prosecutor's statement on grounds Swangim's testimony regarding threats had been stricken from the record when appellant objected at that time to her testimony about such threats. Reference in final argument to facts not in evidence or to testimony ordered stricken is improper. *Buffkin v. State,* (1914) 182 Ind. 204, 106 N.E. 362.

A review of Swangim's testimony shows the prosecutor asked her if she had been warned by anyone not to testify, to which she replied affirmatively. Appellant's objections to such testimony were all overruled until the prosecutor asked what the

person who threatened her had said, whereupon appellant's hearsay objection was sustained and her answer, which was given before the objection was made, was ordered stricken.

There was no misconduct by the prosecutor in this instance. At the time the evidence about threats was offered, the trial court struck only Ms. Swangim's recitation as to the precise remark made to her by an anonymous caller. In final argument the prosecutor referred only to her prior testimony that she had been threatened. He did not refer to the specific remark she made reciting the substance of the threat. Thus, he did not refer to stricken testimony in final argument. No misconduct was committed.

■ Appellant claims the trial court's enhancement of his sentence by ten years is inadequately supported by the trial court's findings regarding reasons for enhancement.

The reasons given by the trial judge for the sentence enhancement are reflected in the order book entry as being the viciousness of the crime and the defendant's conduct during the commission of the crime. The judge explained the conduct as follows: "Your conduct during the commission of this offense is tantamount to a pack of wolves. You kicked this man to death, you did everything you could to kill this fellow . . . ."

The pertinent part of the statute on sentencing reads as follows:

"The criteria listed in subsections (b) and (c) of this section do not limit the matters that the court may consider in determining the sentence." [IC 35–50–1A–7(d)].

Although in several recent cases we have remanded cases to the trial court for a statement of reasons for the enhancement of a sentence, we have not confined the trial court to the specific statements of the statute. In giving credence to paragraph (d) above quoted, we find the trial court gave an adequate statement of the vicious propensities of the appellant to warrant the giving of an enhanced sentence.

The trial court is in all things affirmed.

HUNTER, DeBRULER and PIVARNIK, JJ., concur.

PRENTICE, J., dissents.