## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 20 2018, 10:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Yvette M. LaPlante
Keating & LaPlante, LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Gerrod Pointer,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 20, 2018

Court of Appeals Case No.
82A01-1706-CR-1461

Appeal from the Vanderburgh
Circuit Court

The Honorable David D. Kiely,
Judge

The Honorable Kelli Fink,
Magistrate

Trial Court Cause No.
82C01-1602-MR-973

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Gerrod D. Pointer (Pointer), appeals his conviction for murder, a felony, Ind. Code § 35-42-1-1(1).

We affirm.

# ISSUE

Pointer raises one issue on appeal, which we restate as: Whether the trial court abused its discretion by denying Pointer's motion to exclude the testimony of a witness who was omitted from the State's witness list or, alternatively, by denying Pointer's request to continue the trial.

# FACTS AND PROCEDURAL HISTORY

On February 13, 2016, shortly before 2:00 a.m., Pointer and his uncle, Mark Gulley (Gulley), arrived at the Lucky Lady, a strip club located in Evansville, Vanderburgh County, Indiana. Pointer had driven the pair there in a late model, white sedan. Approximately ten minutes later, Maurice Heyward (Heyward) also arrived at the Lucky Lady. Although a frequent patron of the Lucky Lady, Heyward, at the time, was employed as a bouncer at another Evansville club, the Busy Body Lounge. At some point prior to this night, Pointer and Heyward had been involved in an altercation that resulted in Heyward ejecting Pointer from the Busy Body Lounge. However, there is no indication that Pointer and Heyward had any interaction on this night while at the Lucky Lady.

[5] Within twenty minutes of arriving at the Lucky Lady, Gulley wanted to leave because "the liquor cost too much" and he "didn't like the company" or "the place, it stinks." (Tr. Vol. II, p. 124). Pointer and Gulley left the Lucky Lady at 2:08 a.m., and as they walked down the sidewalk, Pointer waved at a passing police vehicle. He subsequently drove Gulley home; Gulley went to bed and assumed that Pointer also "went home." (Tr. Vol. II, p. 115).

[6] Shortly before 3:00 a.m., two officers with the Evansville Police Department were patrolling the area of the Lucky Lady when one observed "a subject that had on a dark colored jacket, and maybe an orange sweatshirt underneath it" loitering behind a dumpster in the Lucky Lady's parking lot. (Tr. Vol. II, p. 37). However, by the time the officers circled back to disperse the loiterer, the individual was gone.

[7] The Lucky Lady closed at 3:00 a.m. A few minutes later, Heyward and his friend, Jae Post (Post), left the club and walked to the parking lot together. As they stood conversing, Post observed a man emerge from the vicinity of the dumpster and, initially, "didn't think anything of it." (Tr. Vol. II, p. 210). However, as the man approached, Heyward stated, "[H]e's got a gun," and then two gunshots rang out. Post, an Army veteran who is licensed to carry a firearm, retrieved his handgun and, making eye contact with the shooter, fired three shots in return. As the man fled, Heyward yelled out that he had been hit, and Post briefly gave chase to the suspect. Although Post did not see the man again, he observed "a dark blue colored SUV, GM Chevy product, maybe a

Tahoe, Yukon, I'm not sure, I see the passenger door open, see the door shut, and see the SUV pull out and speed off." (Tr. Vol. II, p. 213).

[8] At the same time that Heyward and Post were talking in the parking lot, Marc Berendes (Berendes), who provides security services at the Lucky Lady, was escorting one of the dancers to her vehicle. As they approached the dumpster, Berendes observed "a guy come[] walking out from behind it." (Tr. Vol. II, p. 243). Because the man ignored them, Berendes did not perceive him to be a threat to the dancer, and they continued walking down the sidewalk. Moments later, when the gunshots were fired, Berendes and the dancer hunkered down in front of a truck, at which point "a guy came running fast" past them and got into a newer model "little white car." (Tr. Vol. II, pp. 246-47). The little white car drove off, and Berendes observed as a SUV pulled behind the white car and followed it.

[9] Heyward stumbled toward the door of the Lucky Lady and collapsed on the ground as bystanders attempted to assist him. At the time the shots were fired, two Evansville police officers were in the immediate vicinity and arrived on the scene within moments. Emergency medical personnel also arrived and transported Heyward to the hospital, where he was pronounced dead a short time later. An autopsy revealed that Heyward had been shot once in the left shoulder; his cause of death "was hemopericardium, which is bleeding in the sac around the heart, and hemothorax, which is blood in the chest cavity, and that was due to lacerations of the lung, the left lung in this case, and laceration of the right ventricle of the heart." (Tr. Vol. II, pp. 130-31).

[10] During the ensuing investigation, an Evansville Police Department detective retrieved surveillance footage from four cameras posted on the exterior of the Lucky Lady building. The shooting was captured by the cameras, and the detective ultimately ascertained that the suspect was wearing a brightly-colored red/orange hooded sweatshirt with a dark jacket and light-colored blue jeans, along with distinct black and white shoes. By "work[ing] backwards" through the footage, the detective observed that an individual dressed in the same manner had been at the Lucky Lady earlier that morning, arriving at 1:49 a.m. and departing at 2:08 a.m. (Tr. Vol. II, p. 49). Less than an hour later, at 2:52 a.m., surveillance footage depicted a man in the same attire suddenly emerge from behind the dumpster in the parking lot of the Lucky Lady in order to get into the passenger side of a dark blue Chevrolet SUV that was waiting in the parking lot. Although the SUV was seen driving away, that individual again reappeared from behind the dumpster at 3:04 a.m., at which time he shot Heyward.

[11] Law enforcement officials subsequently released still shots from the surveillance footage to various media outlets, requesting citizen assistance in identifying the suspect. After seeing the photographs of himself and Pointer entering the Lucky Lady circulating on Facebook, Gulley came forward and identified Pointer as the man in the red/orange sweatshirt. In addition, police officers later came across a dark blue Chevrolet SUV that appeared to be the same as the one present in the surveillance video. The SUV was linked to an acquaintance of Pointer.

[12] On February 17, 2016, the State filed an Information, charging Pointer with murder, a felony, I.C. § 35-42-1-1(1). However, Pointer had left the state. Several months later, he was arrested in Kansas on a parole violation and was extradited to Indiana in August of 2016.

[13] During a pre-trial hearing on Friday, May 12, 2017, Pointer orally moved to continue the trial date, which was scheduled to begin the following Monday. In support of a continuance, Pointer argued that

> in the course of their preparation for this case, the State came across a witness, . . . who they've identified, another individual in the video, and they were recently able to talk to that individual, they took a taped statement from him on Tuesday, I believe, I received it Wednesday, and I was gone all day yesterday. I've not reviewed it; however, it would be, based upon a representation made by [the State], it's pretty important information, and I think she would acknowledge that, relative to the case.

(Tr. Vol. II, pp. 4-5). The State, in objecting to a continuance, acknowledged that the witness at issue, Berendes, had been initially unidentifiable in the surveillance footage, but he had finally been identified earlier that week. The State indicated that Berendes provided a taped statement on Tuesday (*i.e.*, six days prior to trial), and the same was provided to the defense the next day. The State added that

> [t]he majority of what this witness has indicated, we already know from the video because his . . . what he witnessed is on video. The only additional information that this witness provides us is the type of vehicle that the runner, who he has not identified

as . . . Pointer, he's not identified the runner as the shooter, he just simply saw someone running past him, and that that individual got into a white car. That is the new information, so I don't know how fruitful or what we're looking at as far as a continuance when the majority, 90% of what this witness is going to testify to is already on camera.

(Tr. Vol. II, p. 6). Because the defense had requested and received a continuance a few months earlier, the trial court denied Pointer's motion to continue.

[14] On May 15 through 17, 2017, the trial court conducted a jury trial. According to the Chronological Case Summary, during a meeting in the trial court's chambers prior to the start of the trial, Pointer moved to exclude the testimony of Berendes as a result of late discovery and because the State omitted his name from its witness list. Pointer also renewed his motion for a continuance. In response, the State argued that Berendes' name had been earlier included in the case file. In fact, Berendes was listed as "[a]nother[] involved" on the Incident/Investigation Report generated on February 13, 2016, by the Evansville Police Department. (Appellant's Conf. App. Vol. II, p. 91). The trial court ordered the State to make Berendes available to the defense and denied Pointer's motions. Thereafter, the jury was sworn and evidence was presented. In addition to the surveillance footage, the State's evidence included the testimony of Post, who identified Pointer in court as the same man he made eye contact with on the night of the murder, as well as testimony from one of the police officers, who recognized Pointer in court as the same man who waved at the police vehicle while walking down the sidewalk and was wearing

the same attire as the shooter. At the close of the evidence, the jury returned a guilty verdict. On June 19, 2017, the trial court held a sentencing hearing and ordered Pointer to execute sixty years in the Indiana Department of Correction.

Pointer now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

Pointer claims that the trial court erred by denying his motions to either exclude the testimony of Berendes or to grant a continuance because the State did not identify Berendes as a witness until a few days prior to trial. In the exercise of the right to present witnesses, both the State and the accused "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Barber v. State*, 911 N.E.2d 641, 646 (Ind. Ct. App. 2009) (quoting *Roach v. State*, 695 N.E.2d 934, 939 (Ind. 1998)). "Trial courts have wide discretion in deciding whether to admit testimony from belatedly disclosed witnesses." *Griffith v. State*, 59 N.E.3d 947, 957 (Ind. 2016). "An abuse of discretion occurs only when the belatedly disclosing party 'engaged in deliberate or other reprehensible conduct that prevents the defendant from receiving a fair trial.'" *Id.* Our supreme court has also stated that "[e]xclusion of the witness' testimony is necessary only where the failure to comply with the discovery order is grossly misleading or demonstrates bad faith on the part of the prosecutor." *Hovis v. State*, 455 N.E.2d 577, 582 (Ind. 1983).

[17]   In this case, Pointer does not argue that the State deliberately sought to conceal Berendes as being a potential witness. *See Griffith*, 59 N.E.3d at 957. Even though Berendes was listed in the investigation report filed by the police, he was not identifiable in the surveillance footage because his back faced the camera as he escorted the dancer to her vehicle. Rather, it was only during a "witness conference[] with one of the Motor Patrol" that the State received "a name of who [the motor patrol officer] thought that might be, just because [the officers] work that area on a regular basis." (Tr. Vol. II, p. 5). Upon meeting with Berendes and taking his statement, the State promptly provided the information to Pointer's counsel. We do note that based on the fact that Berendes' name was included in the initial investigative report, *either* the State *or* Pointer could have reached out to him sooner than the week before trial, but both failed to do so. With Berendes' name at his disposal well before the commencement of trial, Pointer can hardly claim that he was deprived of a fair trial. Furthermore, absent any evidence of reprehensible conduct by the State, we find that the trial court acted within its discretion by denying Pointer's motion to exclude Berendes as a witness.

[18]   Nevertheless, Pointer contends that

> [b]etween the Wednesday when he received the information and the Monday the trial began, defense counsel had two business days to prepare a defense after he learned of Berendes' testimony. This is simply not enough time. Particularly, because he was not given access to Berendes until the day of trial. In order to adequately prepare for the testimony of a key witness, counsel needed time to research the witness to learn if he had any prior

impeachable offenses, interview the witness, analyze his testimony in relationship to the video, and learn whether or not the witness would have a motive to lie. Counsel was not afforded time to do any of these things.

(Appellant's Br. p. 12). Therefore, Pointer alternatively argues that the trial court abused its discretion by denying his request for a continuance.

[19] "We have frequently held that the usual remedy for failure to comply with a discovery order, when the defendant is surprised by testimony from an undisclosed witness or discovers undisclosed evidence relating to a witness' testimony while that witness is on the witness stand, is to move for a continuance." *Hovis*, 455 N.E.2d at 582. "Rulings on non-statutory motions for continuance lie within the discretion of the trial court and will be reversed only for an abuse of that discretion and resultant prejudice." *Barber*, 911 N.E.2d at 645-46. It is an abuse of discretion if the trial court's "decision is clearly against the logic and effect of the facts and circumstances before the trial court." *Id.* at 646. Our court has previously stated that while a continuance should be granted to allow for adequate time to prepare and investigate a case, "a continuance is not meant to be the only remedy available in every case where the prosecution attempts to call a surprise witness. To require the trial court to grant a continuance in every situation would remove necessary flexibility." *Butler v. State*, 372 N.E.2d 190, 193 (Ind. Ct. App. 1978). In the present case, the trial court previously granted a continuance to Pointer in order to allow him additional time to prepare for trial.

[20] "In order to demonstrate an abuse of . . . discretion, the record must reveal that the defendant was prejudiced by the failure to grant the continuance. Thus, even with a showing of surprise, there must also be a showing that the defendant would be harmed by a denial of the continuance." *Id.* at 194 (citation omitted). As already discussed, Pointer could have sooner looked into Berendes based on the fact that he was identified as "[a]nother[] involved" in the Incident/Investigation Report generated on February 13, 2016, by the Evansville Police Department. (Appellant's Conf. App. Vol. II, p. 91). Furthermore, the State promptly provided a copy of Berendes' statement to defense counsel and specified that the only new information the jury would learn from Berendes was that, after hearing gunfire, he observed a man, whom he could not identify, run past him and drive off in a white vehicle. In light of the ample independent evidence of Pointer's guilt—especially the fact that the crime was captured by surveillance cameras, there is a very low probability that Berendes' testimony had an impact on the jury's verdict. Moreover, Pointer admittedly had several days between learning of the State's intent to utilize Berendes' testimony and the trial; yet, the record is unclear as to why Pointer's counsel would not have had access to Berendes during that time as he now claims. *See Davis v. State*, 714 N.E.2d 717, 723 (Ind. Ct. App. 1999) (finding no error in the trial court's denial of a continuance where the defendant "did not take advantage of" a three-day recess to depose the belatedly disclosed witness), *trans. denied*. Accordingly, we cannot say that the trial court abused its discretion by denying Pointer's request for a continuance.

# CONCLUSION

Based on the foregoing, we conclude that the trial court did not abuse its discretion in denying Pointer's motion to exclude certain testimony or, alternatively, in refusing to continue the trial.

Affirmed.

Baker, J. and Brown, J. concur