ATTORNEY FOR APPELLANT
Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Andrew A. Kobe
Deputy Attorneys General
Indianapolis, Indiana

FILED

Sep 29 2016, 2:19 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

## In the
## Indiana Supreme Court

No. 27S00-1503-LW-145

JAMES F. GRIFFITH,

*Appellant (Defendant),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff).*

Appeal from the Grant Superior Court 1, No. 27D01-1208-MR-113
The Honorable Jeffrey D. Todd, Judge

On Direct Appeal

**September 29, 2016**

**Rush, Chief Justice**.

James Griffith was convicted of murder, robbery, and conspiracy to commit robbery, and sentenced to life imprisonment without possibility of parole ("LWOP"). On direct appeal, he claims (1) he was denied due process in discovery; (2) he was denied his right to a speedy trial; (3) the trial court abused its discretion in denying his requests to hire at public expense expert witnesses in DNA and blood spatter; (4) the trial court committed fundamental error by allowing witnesses to remain in the courtroom during opening statements; (5) the trial court abused its

discretion by allowing the State's entomologist to testify; (6) the trial court admitted evidence in violation of the Federal and Indiana Constitutions; and (7) insufficient evidence supported his convictions. Finding that Griffith's claims lack merit, we affirm the trial court in all respects.

## Facts and Procedural History

In his retirement, eighty-one-year-old veteran Duwayne Lindsey enjoyed collecting guns and coins and making daily trips to AMVETS, a local veteran's service organization. He lived alone, but was known to welcome others into his home to share his hobbies. At one point, Lindsey invited his friend's step-son Chris Hisey to come over and help him remodel a closet to fit his gun safe. Hisey obliged and allowed an acquaintance, Griffith, to tag along. Afterwards, Griffith told his girlfriend, Lacy Bradley, about Lindsey's valuable collections. The couple, who had just spent a month in Ohio living off bad checks, decided it was time for a robbery.

One morning, Griffith and Bradley pulled up to Lindsey's house in an Oldsmobile. Griffith asked Lindsey if he could spare a moment to inspect some coins. Lindsey welcomed them inside to a card table, where he had a coin magnifying glass set up. But shortly after he sat down, Griffith nodded to Bradley, who bashed Lindsey's head with a hammer, fracturing his skull. Griffith then pulled out his knife, stabbed Lindsey in the chest, and demanded the combination to Lindsey's safe. Each time Lindsey answered incorrectly, Griffith cut his throat. Eventually, Griffith broke the dial off the safe and pried it open. Over the next hour and a half, Griffith and Bradley stuffed Lindsey's guns, coins, and cash into the Oldsmobile until the trunk "sat down a bit."

The couple then set out on an extended road trip, spending Lindsey's money and calling themselves the modern-day "Bonnie and Clyde." They picked up a friend in Fort Wayne and headed to Batesville to spend the night with Bradley's father, Brian. As Brian helped them unload numerous guns and heavy bags of coins, he thought the couple's behavior was strange. Although Griffith insisted the property was his, he struggled to load a western-style revolver and plucked coins from their proof sets, decreasing their value.

The next day Griffith bought a van with Lindsey's money, moved the Oldsmobile's license plate onto the van, and ditched the Oldsmobile. They continued south to Kentucky and bought a motorcycle, again with Lindsey's cash.

The group eventually pulled into a gas station, near where a pair of Kentucky State troopers were parked. Just as one of the troopers noticed the motorcycle's license plate was expired, Griffith

walked up, map in hand, and asked for directions. The trooper asked for identification, and Griffith said he was "John Scott Griffith." When the trooper saw that name matched an Ohio felony arrest warrant for two counts of forgery, he placed Griffith under arrest.

Realizing her boyfriend was in trouble, Bradley stepped out of the van and claimed the motorcycle was hers. Suspicious, the troopers ran the van's license plate and saw it actually belonged to an Oldsmobile. At that point, Bradley asked if the troopers would leave if she just gave them "the drugs," and she handed over two pill bottles. Then, ignoring orders to stop, she started walking back towards the van to grab her purse—which contained a gun. As she reached for the purse, the troopers pulled her back and placed her under arrest. Soon after, the troopers looked through the van's back window and saw a bloody rifle. They searched the van and found at least fourteen guns and over $25,000 in cash.

Meanwhile, Lindsey's friends were becoming worried as he had not been to AMVETS for almost a week. A fellow veteran went to check on him and found newspapers piling up, the door ajar, and a "horrific" odor coming from within. He called 911, and police found Lindsey's body decaying on the dining room floor. Police also found the house ransacked, the safe empty, and handgun boxes strewn throughout. They entered the serial numbers from the gun boxes into a database and received a hit in Kentucky, which led them to Griffith. Indiana officers then traveled to Kentucky and interviewed Griffith, who still claimed to be "John Scott Griffith." When they told him they were seeking a warrant for his fingerprints, he grabbed a paper clip and started scraping at his fingers.

While Griffith was still jailed in Kentucky for conduct unrelated to the crimes against Lindsey, the State charged him with six counts: murder, felony murder, A-felony robbery, A-felony conspiracy to commit robbery, B-felony aggravated battery, and C-felony receiving stolen property.[1] The State also sought LWOP. On March 11, 2013, Griffith was extradited back to Indiana to face the charges.

Although Griffith was initially appointed two attorneys, he chose to represent himself, retaining one attorney as stand-by counsel. After a two-week trial, the jury found Griffith guilty as

---

[1] We note that, effective July 1, 2014, the General Assembly enacted new versions of the statutes under which Griffith was charged. Class A felony robbery, for example, is now a Level 2 felony. But because Griffith committed his crimes in 2012, we apply the statutes in effect at that time.

charged. To avoid double jeopardy problems, the trial court vacated the felony murder and aggravated battery convictions and reduced the robbery and conspiracy convictions to Class C felonies. The trial court imposed LWOP based on the jury's recommendation, and imposed concurrent eight-year sentences for the robbery and conspiracy convictions, to run consecutively with LWOP.

Griffith now directly appeals his convictions to this Court under Indiana Appellate Rule 4(A)(1)(a), presenting seven issues that we address in turn. Additional facts will be supplied where appropriate.

## Discussion and Decision

### I. Griffith Was Not Denied Due Process in Discovery.

Griffith claims that after he chose to represent himself, the State violated his Fourteenth Amendment due process rights by providing certain pictures in discovery solely by a disc he could not access in jail. He acknowledges that the State accommodated him by printing off the disc's contents and delivering them in a box, but he insists—without citing any support in the record—that pictures of the van and Lindsey's autopsy were missing. The State responds that the box included everything on the disc—roughly 6,000 pages—and even if it lacked several pictures, Griffith could have asked his stand-by counsel to check for and fix such discrepancies. We agree with the State and find Griffith's constitutional claim meritless.

Although the Fourteenth Amendment does not guarantee criminal defendants a general right to discovery, Weatherford v. Bursey, 429 U.S. 545, 559 (1977), it does require prisons to allow inmates "meaningful access to the courts," either by "providing . . . adequate law libraries or adequate [legal] assistance," Bounds v. Smith, 430 U.S. 817, 824, 828 (1977). But here, Griffith had "meaningful access to the courts" for two reasons: (1) no record evidence suggests the box omitted anything from the disc; and (2) even if it did, Griffith could have asked stand-by counsel to check for such discrepancies and could have requested a continuance.

First, Griffith claims the box was missing material from the disc, but nothing in the record supports this assertion. All we know is what happened at trial: when the State presented pictures of the van and autopsy, Griffith said they were not in the box, but the State said they were. The trial court, exercising its discretion, overruled the objections. And now on appeal, Griffith fails to point to anything—other than his own unsworn objections at trial—that the box was incomplete.

4

To the contrary, he admits the box contained roughly 6,000 pages of discovery. Those documents included written copies of "reports and statements," transcripts of police interviews, and hundreds of photographs.

Second, even if we accept Griffith's position that the box was missing material from the disc, he offers no excuse for failing to ask his counsel to check for such discrepancies and failing to request a continuance. From start to finish, Griffith had some form of counsel. Indeed, *when he received the disc*, he had two court-appointed lawyers at his service—Grant County Chief Public Defender Robert Rittman and Attorney Jerry Drook. Attorney Drook, in particular, stated his willingness to print off the disc's contents. Surprisingly, though, Griffith dismissed both attorneys and chose to represent himself, ignoring the trial court's extensive warnings:

Court: You understand that Mr. Rittman, and Mr. Drook are experienced trial attorneys? That Mr. Rittman and Mr. Drook have tried murder cases in the past? Numerous cases? They've been through this process before. They are known to be able counsel in this county.

Griffith: Yeah I've never represented myself in a murder trial, I'll say that much, but I just don't see me having a standing chance.

. . . .

Court: This is a very serious request you're considering. You need to think about it very carefully . . . .

Two weeks later, Griffith and the judge picked up where they left off:

Court: You understand that you have [the] right to be defended in this case by an attorney.

Griffith: Yes.

. . . .

Court: And you understand that not having an attorney, and instead representing yourself in a criminal proceeding[] is almost always unwise?

Griffith: Yeah.

Court: You understand that if you represent yourself, you will have to follow all the same rules as an attorney, and you will receive no special help from the Court?

Griffith: Yes.

. . . .

5

Court:   You understand that an attorney would be able to help you investigate and question witnesses before trial?

Griffith:   Yes.

Court:   Get any favorable evidence to present in your defense?

Griffith:   Yes.

Court:   Prepare and file useful pre-trial motions?

Griffith:   Yes.

. . . .

Court:   I find that you have knowingly, intelligently, and voluntarily waived your right to counsel, and I'm discharging Mr. Rittman and Mr. Drook at this time.

But, even after dismissing his lawyers, Griffith was allowed stand-by counsel:

Griffith:   Okay. Well the last thing . . . . Is there any way that I can get an assistant [sic] of counsel, that way I can still do it my way, but I have somebody to help me get my outside resources?

Court:   Alright. So you're, you're asking the Court what's sometimes referred to as a standby counsel?

Griffith:   Yeah.

The Court granted that request and named Chief Public Defender Rittman as stand-by counsel. Rittman embraced that role by stepping in at key moments throughout trial—helping to preserve objections and schedule witnesses. Simply put, Griffith offers no excuse for failing to utilize that resource, asking Rittman to check for and fix discrepancies between the box and the disc. And he offers no excuse for not requesting a continuance when the State presented the van and autopsy pictures at trial. See Flores v. State, 485 N.E.2d 890, 894 (Ind. 1985) (noting that a request for a continuance is the proper response to belated disclosures).

In sum, Griffith has not shown that the State deprived him of "meaningful access to the courts" under the Fourteenth Amendment[2] or that the trial court abused its discretion in admitting the allegedly late-disclosed pictures.

## II.   Griffith Was Not Denied His Speedy Trial Rights.

Griffith claims that the twenty-month span between his Kentucky arrest on July 25, 2012 and Indiana trial on April 11, 2014 violated his speedy trial rights, as guaranteed by Indiana

---

[2] It is quite possible that the State could violate a pro se prisoner's due process rights by providing discovery solely in a format it knows the prisoner has no means of accessing. We hope never to see such a case.

Criminal Rule 4(C) and the Federal and Indiana Constitutions. But the State responds that Griffith starts the speedy trial clock too early—that it began ticking not when Kentucky arrested Griffith on *unrelated* charges, but when Indiana arrested him on the *current* charges, including murdering and robbing Lindsey. We agree. And from that Indiana arrest on March 11, 2013 until trial, Griffith caused most of the thirteen-month delay, either asking for or agreeing to all three continuances. The trial court thus properly denied his motion for discharge. We address Rule 4(C) and the Federal and Indiana Constitutions in turn.

### A. Rule 4(C)

Griffith seeks relief under Indiana Criminal Rule 4(C)—the "one-year rule." Rule 4(C) requires the State to bring a defendant to trial within one year, excluding any delays attributable to the defendant or court congestion. That one-year clock begins ticking on the later of two dates: (1) the filing of criminal charges or (2) the arrest on those charges. Ind. Crim. Rule 4(C). If the defendant is jailed outside Indiana when charged, arrest occurs once he is returned to Indiana's "jurisdiction and exclusive control." Sweeney v. State, 704 N.E.2d 86, 100 n.27 (Ind. 1998).

The parties do not dispute that Griffith asked for or agreed to all three continuances. Rather, they dispute what date triggered the one-year clock—a question of law that we review de novo. See Austin v. State, 997 N.E.2d 1027, 1039 (Ind. 2013). Here are the relevant dates:

- July 25, 2012: Kentucky arrests Griffith for conduct unrelated to the crimes against Lindsey.
- August 2, 2012: While Griffith is still jailed in Kentucky, Indiana charges him for the crimes against Lindsey and issues an arrest warrant.
- March 11, 2013: Griffith is extradited, and Indiana serves the arrest warrant.
- March 12, 2013: Initial hearing is held. Counsel appears for Griffith. Jury trial is set for 7-29-2013.
- June 20, 2013: On Griffith's motion for continuance, jury trial is pushed back from 7-29-2013 to 9-30-2013.
- August 12, 2013: Griffith again moves to continue jury trial.
- August 29, 2013: Jury trial set for 9-30-2013 is pushed back to 3-10-2014 per agreement of the parties.
- February 12, 2014: Griffith, now pro se, files motion for indefinite continuance.
- February 25, 2014: Court cancels trial set for 3-10-2014 and grants a continuance, but not indefinitely, and resets trial for 4-11-2014.
- April 11, 2014: Griffith's Indiana trial starts.

As the timeline shows, although Indiana charged Griffith with the crimes against Lindsey on August 2, 2012, he was at that time still jailed in Kentucky for unrelated conduct. Indiana did

not actually arrest Griffith until March 11, 2013—when he was brought back within the state's "jurisdiction and exclusive control." Sweeney, 704 N.E.2d at 100 n.27. Thus, the one-year clock started ticking on March 11, 2013.

And most of the thirteen-month lapse from that date until the April 11, 2014 trial was Griffith's own doing. Indeed, Griffith admits he asked for or agreed to all three continuances, which collectively delayed trial 251 days—over eight months. Subtracting Griffith's 251-day delay from the 396-day total, he was brought to trial within 145 days. This was amply within the one-year limit imposed by Rule 4(C).

### B. Federal and Indiana Constitutional Speedy Trial Rights

We turn next to whether Griffith was denied his speedy trial rights under Article 1, Section 12 of the Indiana Constitution[3] or the Sixth Amendment to the United States Constitution.[4] Because Griffith asserts these constitutional violations without providing analysis, the State claims waiver. Potential waiver notwithstanding, we find no constitutional violations.

In evaluating both federal and Indiana constitutional speedy trial claims, courts balance the same four factors: (1) the length of delay; (2) the reason for delay; (3) the defendant's assertion of the right to a speedy trial; and (4) any resulting prejudice to the defendant. Barker v. Wingo, 407 U.S. 514, 530 (1972) (applying those factors to federal claim); Sweeney, 704 N.E.2d at 102 (applying same factors to Indiana claim). Turning to those factors, we first note the delay was not excessive. Although Indiana issued the warrant for Griffith's arrest on August 2, 2012, Griffith was not actually arrested until his extradition on March 11, 2013. Second, from that day until trial on April 11, 2014, Griffith was the primary "reason for delay." He either requested or agreed to all three continuances of the trial date, causing more than eight months of delay over this thirteen-month period. Third, while Griffith did assert his speedy trial right by filing a motion to discharge, he filed that motion just two months after requesting an indefinite continuance. In other words, he requested a speedy trial shortly after he delayed trial. Fourth, Griffith fails to show any prejudice

---

[3] "All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay." Ind. Const. art. 1, § 12.

[4] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI.

from the delay. See Lee v. State, 684 N.E.2d 1143, 1146 (Ind. 1997) (noting that showing prejudice is the defendant's burden). Indeed, delay "may work to the accused's advantage," Barker, 407 U.S. at 521—and here, Griffith's requests for or assent to three continuances imply that he thought delaying his murder trial was advantageous.

The trial court thus did not err in denying Griffith's motion for discharge under the Federal and Indiana Constitutions.

## III.    Griffith Was Not Entitled to DNA and Blood Spatter Experts at Public Expense.

Griffith argues the trial court abused its discretion in denying his motions for public funds to hire expert witnesses in DNA and blood spatter—motions he filed just one month before trial. Indiana leaves decisions to hire expert witnesses at public expense to the trial court's sound discretion. Scott v. State, 593 N.E.2d 198, 200 (Ind. 1992). The defendant is not entitled to "any and all experts [he] believes might be helpful"—rather, he bears the burden of showing a need. Tidwell v. State, 644 N.E.2d 557, 560 (Ind. 1994). The trial court found Griffith failed to meet that burden. And we agree.

Griffith's requests failed to provide even the most basic information—*why* he needed DNA and blood spatter experts, *whom* he would like to hire, and *how much* they would cost. To justify the DNA expert, Griffith simply asserted that the State's DNA evidence was too incriminating—because, for example, it indicated that his DNA was on the latex glove found beside Lindsey's body. Likewise, to justify the blood spatter expert, Griffith simply stated his desire to show that blood was found all over Lindsey's house, thereby rebutting Bradley's testimony that the murder took place by the card table. But it does not take an expert to describe the location of blood; any crime scene witness can do that. Here, the trial court did not abuse its discretion in refusing to spend public funds on unnecessary experts of unknown identity, cost, and qualifications.

## IV.    The Trial Court Did Not Commit Fundamental Error in Allowing Unknown Witnesses to Hear Opening Statements Despite a Separation Order.

Griffith argues the trial court erroneously allowed witnesses to remain in the courtroom during opening statements despite a separation of witnesses order. Normally, we review a trial court's determination regarding an alleged violation of a separation of witnesses order for abuse of discretion. Wisner v. Laney, 984 N.E.2d 1201, 1208 (Ind. 2012); Goolsby v. State, 517 N.E.2d 54, 60–61 (Ind. 1987). But here, since Griffith failed to raise a timely objection at trial, he may

avoid waiver only by showing that permitting the witnesses to hear opening statements constituted fundamental error. See Knapp v. State, 9 N.E.3d 1274, 1281 (Ind. 2014). Because he cannot meet that "daunting standard," see id., we affirm on this issue as well.

Indiana Evidence Rule 615 allows litigants to move for separation of witnesses so they cannot hear each other's testimony. See Long v. State, 743 N.E.2d 253, 256 (Ind. 2001). Invoking that rule, Griffith filed a pretrial motion for separation of witnesses, which the trial court granted.

But on the first day of trial, the court made two exceptions to that separation order, and Griffith raised no objections:

> Court: The jury will be in just a moment. Uh, a couple of preliminary matters. I think when we ended Friday, there was a request that the first witness from the State, who is a relative of Mr. Lindsey, the request was that she remain in the courtroom after she's completed her testimony is my understanding there is no objection to that. Is that right?
>
> Griffith: There is not. As long as she don't [sic] make a [scene] I'm cool with it.
>
> Court: Okay. The other is I know there are some witnesses in the courtroom here currently. Even though there is a separation of witness order[], witnesses may remain in the courtroom during opening statements because they're not listening to any other witnesses' testimony. As soon as the opening statements are over, they'll be excused and asked to remain in the hallway until they're called to testify.

As stated above, since Griffith did not object to the witnesses hearing opening statements, he must now prove fundamental error by showing the alleged violation was "so prejudicial to [his] rights as to 'make a fair trial impossible.'" Ryan v. State, 9 N.E.3d 663, 668 (Ind. 2014) (quoting Benson v. State, 762 N.E.2d 748, 756 (Ind. 2002)). But even if the trial court erred in allowing witnesses to hear opening statements, Griffith fails to show what, if any, prejudice he suffered. Nothing in the record identifies *which* witnesses remained in the court room, *how much* of the opening statements they heard, or *how* hearing opening statements influenced them. Without those critical details, we cannot agree that a fair trial was impossible.

## V.    The Trial Court Did Not Abuse Its Discretion by Allowing the State's Entomologist to Testify.

Griffith claims the trial court abused its discretion by allowing forensic entomologist Dr. Haskell to testify about Lindsey's time of death based on maggot evidence because the State gave insufficient notice it would call him as a witness. Trial courts have wide discretion in deciding

whether to admit testimony from belatedly disclosed witnesses. See, e.g., Taylor v. State, 676 N.E.2d 1044, 1046 (Ind. 1997). An abuse of discretion occurs only when the belatedly disclosing party "engaged in deliberate or other reprehensible conduct that prevents the defendant from receiving a fair trial." Id.; see also Liddell v. State, 948 N.E.2d 367, 370 (Ind. Ct. App. 2011). Bearing that standard in mind, we hold that Griffith's claim fails for two reasons: the State adequately disclosed Dr. Haskell months before trial, and, at the very least, did not deliberately conceal him.

First, the State timely disclosed Dr. Haskell. In March 2013, Griffith filed a motion for pretrial discovery, requesting a list of all persons the State intended to call as witnesses. And although the State's initial discovery notice did not reference Dr. Haskell, a supplemental notice did. On November 18, 2013—still five months before trial—the State served Griffith with a notice of supplemental discovery compliance stating that "all persons identified and/or referred to" in the material provided "may also be called to testify." The third page of that notice clearly stated "Dr. Haskell Report (14 pages)," thus identifying and referring to Dr. Haskell. In addition, the State enclosed Dr. Haskell's fourteen-page report so Griffith could know the exact substance of the entomologist's anticipated testimony. Thus, as the trial judge rightly stated, the supplemental compliance "put[] the Defendant on notice that Dr. Haskell may be called as a witness to testify."

Second, even if the State belatedly disclosed Dr. Haskell, that belated disclosure was not "deliberate" or "reprehensible," as required for reversal. Taylor, 676 N.E.2d at 1046. On three separate occasions, the State referenced Dr. Haskell. First, as noted, the State identified Dr. Haskell and provided his report months before trial. Second, the State identified Dr. Haskell during voir dire when asked to list intended witnesses. And finally, the day before Dr. Haskell took the stand, the State reminded Griffith that it planned to call him as a witness. Griffith did not express surprise at any of these announcements. Nor did he request a continuance, which, again, is the usual remedy for belated disclosures. See Flores, 485 N.E.2d at 894.

Here, Griffith's claim fails as the trial court did not abuse its discretion by allowing Dr. Haskell to testify.

## VI.    The Trial Court Properly Admitted Evidence Found in Griffith's Van.

Griffith next argues the trial court erred in admitting evidence seized from the van because the warrant was impermissibly "general," in violation of both the Federal and Indiana

Constitutions.[5] The State responds that the warrant was far from general, specifically describing the van's color, VIN number, and license plate registration, as well as the items to be seized. Reviewing this question of law de novo, Garcia v. State, 47 N.E.3d 1196, 1199 (Ind. 2016), we agree with the State.

Both the Federal and Indiana Constitutions prohibit "general"—that is, overbroad—search warrants. Stanford v. Texas, 379 U.S. 476, 480 (1965) (Fourth Amendment); Overstreet v. State, 783 N.E.2d 1140, 1158 (Ind. 2003) (Article 1, Section 11 of the Indiana Constitution). To avoid giving police "unbridled discretion," a warrant must describe "with some specificity" the place to be searched and items to be searched for. Overstreet, 783 N.E.2d at 1158.

Here, the van warrant amply met that standard. First, it specifically described the place to be searched: "A white 1997 Dodge van, VIN: 2B7HB21X3VK566874, bearing Ohio registration plate EVU8737." Second, it specifically enumerated the items to be seized: "narcotics (both legal and illegal) prescribed to Duwayne M. Lindsey, computer equipment, cellular phones and other electronic recording devices, money, journals recording illegal activities, stolen property included but not limited to firearms, collector coins, United States mint sets. Evidence described as blood, DNA, and any trace evidence or body fluids and any property belonging to Duwayne M. Lindsey." We thus hold the van warrant was not general and properly constrained police discretion.

## VII. Sufficient Evidence Supports Griffith's Convictions.

Finally, Griffith argues there is insufficient evidence to prove he murdered and robbed Lindsey. Sufficiency-of-the-evidence claims face a steep standard of review: we consider only the evidence and reasonable inferences most favorable to the convictions, neither reweighing evidence nor reassessing witness credibility. Gibson v. State, 51 N.E.3d 204, 210 (Ind. 2016). We affirm the judgment unless no reasonable factfinder could find the defendant guilty. Id.

Here, Griffith relies on the same story the jury rejected: that Bradley acted alone. But his version of events fares no better on appeal—as it still runs against overwhelming incriminating evidence, including Bradley's eyewitness testimony, DNA evidence, and the fact that Griffith was caught in possession of Lindsey's property.

---

[5] To the extent Griffith claims any other constitutional search and seizure violations, he has waived those arguments by failing to provide cogent reasoning. See Ind. Appellate Rule 46(A)(8)(a).

12

Bradley gave extensive, compelling eyewitness testimony. She testified she was in love with Griffith, and when he asked her to help him murder and rob an elderly veteran who collected guns and rare coins, she agreed. The couple lied their way into Lindsey's home, and once Griffith gave the signal, Bradley bashed their host's head with a hammer. Then Griffith took over. He stabbed Lindsey in the chest and pushed him to the floor. Lindsey asked why they were doing this and begged them to let him live. But Griffith responded only by demanding the safe's combination and slitting Lindsey's throat after every incorrect answer. Eventually Griffith opened the safe, and the couple spent the next hour and a half packing Lindsey's guns, coins, and cash into the getaway car. Now on appeal, Griffith asks that we not believe Bradley because she was "not right in the head and [has] been diagnosed bipolar and schizophrenic." But that credibility attack is too little—and comes too late.

Additionally, DNA evidence linked Griffith to the murder. For example, the bloody latex glove found beside Lindsey's body and the bloody shoes found in the van contained DNA from which two people could not be excluded as contributors—Lindsey and Griffith. Likewise, the bloody blue jeans and sweatshirt found in the van contained DNA from which three people could not be excluded as contributors, including Lindsey and Griffith. This evidence supports reasonable inferences that Griffith's DNA was in Lindsey's house and that Lindsey's DNA was in Griffith's van.

Furthermore, Griffith was caught with Lindsey's property mere days after the murder. In the van, police found four of Lindsey's guns, his hatchet, his briefcase, several empty prescription bottles in his name, and over $25,000 in cash. In the Oldsmobile, they found another prescription pill bottle in Lindsey's name and a small ring inscribed "RCA"—the initials of Lindsey's former employer.

Against that evidence, Griffith's sufficiency claim fails. Substantial—indeed, over-whelming—evidence indicates that Griffith murdered and robbed Lindsey.

## Conclusion

For the foregoing reasons, we affirm James Griffith's convictions.

Rucker, David, Massa, and Slaughter, JJ., concur.