## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 30 2017, 9:13 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark A. Thoma
Deputy Public Defender
Leonard, Hammond, Thoma & Terrill
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Mar'Quita D. Thomas, *Appellant-Defendant,* | November 30, 2017 |
| v. | Court of Appeals Case No. 02A03-1706-CR-1359 |
| | Appeal from the Allen Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Frances C. Gull, Judge |
| | Trial Court Cause No. 02D05-1610-F4-68 |

**Kirsch, Judge.**

[1] Mar'Quita D. Thomas ("Thomas") was convicted following a jury trial of attempted arson[1] as a Level 4 felony and criminal mischief[2] as a Class B misdemeanor, and the trial court ordered her to serve an aggregate executed sentence of six years and 180 days in the Indiana Department of Correction ("the DOC"). Thomas appeals, raising the following restated issues:

> I. Whether her convictions for attempted arson and criminal mischief were supported by sufficient evidence;

> II. Whether the trial court abused its discretion during sentencing; and

> III. Whether her sentence is inappropriate considering the nature of the offense and the character of the offender.

[2] We affirm.

## Facts and Procedural History

[3] In September 2016, Thomas and her girlfriend, B.R., were living together with B.R.'s four children, in B.R.'s Allen County home. Around 6:40 a.m. on the morning of September 30, Fort Wayne Police Department ("FWPD") dispatch received a 911 call from B.R., who reported that Thomas, identified by B.R. as her ex-girlfriend, had broken a window in B.R.'s house. B.R. told dispatch that she was pregnant, and Thomas had beaten her up in the presence of her four

---

[1] *See* Ind. Code §§ 35-43-1-1(a), 35-41-5-1.

[2] *See* Ind. Code § 35-43-1-2(a).

children and then left the residence on foot. FWPD Officer Rickey Parrish ("Officer Parrish") responded to the scene and took a photograph of the broken window. He also noted that B.R.'s hair was in disarray, and her shirt was pulled to one side and partially torn. Officer Parrish did not encounter Thomas at that time.

[4] In the early morning hours of October 2, 2016, FWPD 911 dispatch received another call from B.R., who reported that her ex-girlfriend, Thomas, had hit B.R. in the face and was trying to take her cell phone. B.R. said that Thomas was drinking and had left the residence on foot carrying a liquor bottle. B.R. also told dispatch that Thomas had done the following: entered B.R.'s house without permission; broken B.R.'s window; and repeatedly appeared at B.R.'s house and harassed her. *State's Ex.* 2. B.R. explained that she had told Thomas she wanted nothing to do with her. Officers Jason Fuhrman[3] ("Officer Fuhrman") and Kevin Peeper ("Officer Peeper") responded to the scene around 3:36 a.m., walked around the property, spoke with B.R., and "cleared [the] run at 3:46 a.m." *Tr. Vol. 2* at 73.

[5] Ten minutes later, B.R. called 911 to report that Thomas had returned and was outside "beating on [her] window." *State's Ex.* 3. B.R. asked the officers to "hurry up" because Thomas had "already busted one of [her] windows." *Id.* Officers Fuhrman and Peeper returned to B.R.'s home and found Thomas

---

[3] We note that Fuhrman had been promoted by the time of trial; however, because he was an "officer" when he responded to the call, we use that designation. *Tr. Vol. 2* at 71.

standing by the home's side door, located next to the driveway, with a gas can in her hand. Officer Fuhrman, who smelled "a strong odor of gasoline in the air," noted that Thomas had slurred speech, smelled of gasoline and alcohol, and was "kind of swaying around." *Tr. Vol. II*. at 74, 75-76. Before placing her in the back seat of the cruiser, the officers put Thomas in handcuffs and, while searching her person for weapons, found two lighters.

[6] On October 5, 2016, the State charged Thomas with domestic battery as a Level 6 felony and criminal mischief as a Class B misdemeanor, based on the events of September 30, and with attempted arson as a Level 4 felony, based on the events of October 2. During the two-day jury trial, Officer Parrish testified that, on September 30, he responded to a call from B.R. reporting that Thomas had broken her window and had also hit B.R. in front of her children. During direct examination, Officer Parrish identified State's Exhibits 8 and 9 as photographs he had taken of the broken window. In the State's case-in-chief, B.R. conceded that she reported, in her 911 call of September 30, that Thomas broke her window, yet denied that Thomas had actually broken her window.

[7] Officers Fuhrman and Peeper testified that they had been dispatched to B.R.'s home twice in the early morning hours of October 2. Officer Fuhrman explained that, during the second visit, he encountered Thomas with a gasoline can in her hand. Officers Fuhrman and Peeper testified that there was a very strong smell of gasoline in B.R.'s backyard, on the driveway side of the home, and on Thomas's person. Resting at the threshold of B.R.'s side door, Officer Fuhrman found a piece of paper, torn from a Kingsford charcoal bag, with a

burnt corner. Both officers testified that the smell of gasoline had not been present fifteen minutes earlier, during their first visit. *Id*. at 75, 86-87.

[8] The smell of gasoline, Thomas's two lighters, and the partially burnt paper prompted Officer Fuhrman to call Captain Thomas Rotering ("Captain Rotering"), an arson investigator with the Fort Wayne Fire Department. Once at the scene, Captain Rotering walked around B.R.'s house and found on the grass an empty gasoline can with a separated collar and spout. Captain Rotering noticed that the odor of gasoline intensified as he walked around the back of the house, and it remained strong as he walked to the other side of the yard, where he found a second can of gasoline near a lawnmower. Along the driveway side of the house, near the door, Captain Rotering noticed that the gasoline smell was "very strong," and, at the threshold of that side door, Captain Rotering found the partially burnt paper. *Id*. at 103.

[9] Captain Rotering believed that an arson investigation was necessary, saying, "[I]t would be very uncommon for somebody to have gasoline poured around their house." *Id*. He found it suspicious that the nozzle and collar of the gas can were off, the can was completely empty, the gasoline had been poured on the lawn recently, and there was burnt paper on the threshold to the house. *Id*. at 103-04. Based on his knowledge of fire science, Captain Rotering determined that the burnt paper had been ignited and then placed intentionally on the threshold, saying, "[I]t's scientifically impossible for [the paper] not to have burned in that place." *Id*. at 109. He said that the fire was recent because the ash was still there and would have blown away if there had been wind or

the door had opened. Based on his observations, Captain Rotering believed someone had tried to intentionally set a fire.

[10] During trial, B.R. changed her version of events, testifying that she and Thomas were still dating on October 2 and that Thomas did not break her window. B.R. also testified that she had called her gas utility about a smell of gas a few days before the attempted arson, and the employee said the smell was gasoline, not natural gas.

[11] Thomas, testifying on her own behalf, denied breaking the window on September 30. While admitting that she and B.R. had argued that day, Thomas asserted that the disagreement related to Thomas not helping around the house. Regarding the events of October 2, Thomas testified that the family was planning a cookout, and while buying groceries, Thomas and her stepson bought gasoline for the lawnmower. Thomas said that the family had two gas containers, but that one was broken and did not contain gasoline. Thomas testified that B.R. went out that evening, and when she returned in the middle of the night, B.R. woke up Thomas, and the two argued about Thomas not having cleaned up after grilling. Thomas went outside, but was drunk, and while returning to the house, she "tripped over the gas can, the grill, everything." *Id*. at 191-92. Thomas testified, "I fell right on the gas, laid in the gas. I was -- I just wanted to lay down." *Id*. at 192. Thomas explained that she had tripped over the grill, causing "ashes and everything" to go "all over the metal, all over my porch, my step." *Id*. at 193. Thomas said she was trying to

pick up the spilled gas can when the police arrived. Thomas acknowledged having two lighters in her pocket, but claimed she also had cigarettes.

[12] In rebuttal for the State, the gas utility employee who responded to B.R.'s call testified that he did not recall smelling gasoline at B.R.'s home. Officer Fuhrman testified that, contrary to Thomas's statement, she did not possess cigarettes when arrested. Captain Rotering testified that the ash on the stoop was inconsistent with charcoal ash from barbequing because it was not granular; instead, the ash matched the paper. He also testified that the paper with the burnt corner was intentionally placed on the step. Finally, the State presented a recording of a call Thomas made from jail, in which she admitted that she broke B.R.'s window.

[13] The jury found Thomas guilty of attempted arson and criminal mischief. but acquitted her of domestic battery. At sentencing, Thomas's mother testified that Thomas has "a real good heart" but also has "a drinking problem and she really need[s] help with it." *Tr. Vol. 3* at 38. In her testimony, B.R. asked the court to be lenient in sentencing because Thomas "loved [her] and [her] kids a lot." *Id*. at 49. On her own behalf, Thomas maintained she was innocent, but acknowledged, "[I]f I had not drank myself into a complete altered state, I . . . would not be here today." *Id*. at 55. The trial court found Thomas's consistent employment history was a mitigating factor and found her criminal history and the circumstances of the crime were aggravating factors. Thomas was committed to the DOC for a term of six years for attempted arson and 180 days for criminal mischief, to run consecutively. Thomas now appeals.

# Discussion and Decision

## I. Sufficiency of the Evidence

[14] Thomas contends that the evidence was insufficient to support her convictions of attempted arson and criminal mischief. Sufficiency of evidence claims "face a steep standard of review": we consider only the evidence and reasonable inferences most favorable to the convictions. *Griffith v. State*, 59 N.E.3d 947, 958 (Ind. 2016). "It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction." *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We will affirm the conviction unless no reasonable fact-finder could find the defendant guilty beyond a reasonable doubt. *Griffith*, 59 N.E.3d at 958. "It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence." *Drane*, 867 N.E.2d at 147 (internal quotation marks omitted). "We will hold the evidence sufficient if an inference may reasonably be drawn from it to support the verdict." *Buelna v. State*, 20 N.E.3d 137, 141 (Ind. 2014) (internal quotation marks omitted).

[15] Recognizing that our court cannot reweigh the evidence or assess witness credibility, Thomas argues that we must review a conviction "with a mind towards the strong presumption of innocence until proven guilty," and "impinge on what is generally considered to be the jury's responsibility to judge witness credibility when it is confronted with inherently improbable testimony[.]" *Appellant's Br.* at 20. Thomas argues that in such light no

reasonable fact-finder could have found Thomas guilty of the crimes. We disagree.

### A. Attempted Arson

[16] Indiana Code section 35-43-1-1, as relevant here, provides that a person who, by means of fire, knowingly or intentionally damages the property of any person under circumstances that endanger human life, commits arson, a Level 4 felony. Thomas is charged with attempted arson. To be guilty of an attempt, the actor must act with the culpability required for the commission of the crime and engage in conduct constituting a substantial step toward committing the offense. Ind. Code § 35-41-5-1.

[17] The evidence presented to the jury was that, in the early morning hours of October 2, 2016, Officers Fuhrman and Peeper were called to B.R.'s house twice, just fifteen minutes apart. *Tr. Vol. 2* at 72, 85-86. Upon arriving the second time, Officer Fuhrman saw Thomas standing in the yard with a gasoline can in her hand. *Id*. at 75. Officer Fuhrman testified that he noted an overwhelming odor of gasoline in the air and could smell gasoline fumes emanating from Thomas's person. *Id.* at 74-76. Officer Peeper testified that, when he got to B.R.'s side door, "there was an overwhelming smell of gasoline pretty much throughout the backyard and on the side of the house." *Id*. at 86. He testified, "[W]hen I got to Officer Fuhrman's location with [Thomas], there was an overwhelming smell of gasoline both on her person and, like I said, right in the general[.]" *Id*. Both officers testified that the smell of gasoline had not been present fifteen minutes prior, during their first visit. *Id*. at 75, 86-87.

Resting at the threshold of B.R.'s driveway-side door, Officer Fuhrman found a piece of paper, torn from a Kingsford charcoal bag, with a burnt corner. Officer Fuhrman called Captain Rotering to the scene to conduct an arson investigation.

[18] Captain Rotering, who was qualified as an expert in the field of fire investigation, testified as to his opinion:

> [T]he gasoline was taken out of the can that I found that was empty, it was spread along the back of the house and up the side of the house or the right side of the house up to and including the area of the door. I believe the paper was taken from underneath the grill, torn off of that bag, because that paper was dry and it had been raining all night. I believe that was taken around to the side of the house, it was then ignited with an open flame, and it was let burn and then either placed or thrown on the threshold of the door where it, for numerous reasons and luckily, did not ignite the gasoline that was present around the house.

*Tr. Vol. 2* at 129. Captain Rotering opined that the paper's ash on the stoop "showed that particular paper and that particular ash burned in that particular place, it was intentionally put there[.]" *Id*. at 109. He testified that the fire was recent because the ash was still there and would have blown away if there had been wind or the door had opened. *Id*. at 141. Based on his observations, Captain Rotering stated, "[I]if it would have ignited, we would have had a significant fire and a significant problem with, one, the children that I saw inside the living room, and two, it would have ignited the house itself very readily and quickly . . . ." *Id*. at 129. By pouring gasoline in the yard and by

placing the ignited paper on the threshold of B.R.'s house, Thomas took a substantial step toward knowingly or intentionally damaging B.R.'s house by means of fire, under circumstances that put B.R.'s and her children's lives in jeopardy. This evidence was sufficient to support Thomas's conviction for attempted arson.

[19] On appeal, Thomas argues that, in light of the evidence offered by the defense, the above evidence was insufficient to support her conviction. Regarding the smell of gasoline, Thomas suggests that there could have been an existing smell of gasoline that the utility employee overlooked. *Appellant's Br*. at 23. She also contends that the State's evidence "was consistent with [her] testimony," which was that the family had a cookout on the night in question; the charred paper fell out of the grill that Thomas tripped over; and Thomas smelled of gasoline because she tripped over and spilled the contents of the gas can. *Id*. at 23-25. However, Thomas presented this same evidence to the jury during her trial, and the jury did not find her testimony to be credible. Accordingly, Thomas's argument on appeal is merely a request that we reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See Thacker v. State*, 62 N.E.3d 1250, 1252 (Ind. Ct. App. 2016) (citing *Drane*, 867 N.E.2d at 146). Here, the evidence was sufficient to support Thomas's conviction for attempted arson.

## B. Criminal Mischief

[20] Thomas also contends that the State presented insufficient evidence to convict her of criminal mischief. A person who recklessly, knowingly, or intentionally damages or defaces property of another person without the other person's

consent commits criminal mischief, a Class B misdemeanor. Ind. Code § 35-43-1-2(a). On appeal, Thomas challenges only the sufficiency of the evidence that she knowingly, intentionally, or recklessly broke the window. *Appellant's Br.* at 21.

[21] The evidence presented at trial supporting Thomas's conviction for intentionally breaking the window was that B.R. called the police on September 30, 2016, and reported that Thomas had broken a window in B.R.'s house. *State's Ex.* 1. When Officer Parrish responded, he took a photograph of the broken window. Those photographs, which Officer Parrish identified as State's Exhibits 8 and 9, were introduced into evidence during the trial. *Tr. Vol. 2* at 67. Additionally, B.R. made two 911 calls on October 2, 2016, and in each call she repeated the accusation that Thomas broke a window in her house. *State's Exs.* 2 & 3. Finally, after her arrest and while in jail, Thomas made a phone call and was recorded saying that she broke B.R.'s window two days earlier. *State's Ex.* 67.

[22] On appeal, Thomas argues that it is not clear how the window was broken, and therefore, her conviction cannot be supported by the evidence. *Appellant's Br.* at 21. She notes that the allegations B.R. made about the broken window in her 911 calls to police are not credible in light of the fact that B.R. has been convicted of crimes of dishonesty on four prior occasions. *Id.* She also cites to B.R.'s trial testimony in which B.R. denied that Thomas broke the window. *Id.*

Again, Thomas is asking this court to reweigh the evidence and take from the jury its proper functions of judging the credibility of witnesses, which we cannot do. *Thacker*, 62 N.E.3d at 1252. Based on the State's evidence, including Thomas's own admission, a reasonable jury could have found sufficient evidence that Thomas knowingly, intentionally, or recklessly broke the window and, thereby, committed criminal mischief. Accordingly, the evidence was sufficient to support Thomas's conviction for criminal mischief.

## II. Abuse of Discretion

Thomas argues that the trial court abused its discretion during sentencing by finding her criminal history to be an aggravating factor, instead of mitigating, as she argued, and by refusing to allow alternative sentencing on the basis of Thomas's "strong support system." *Appellant's Br*. at 27-28. "The finding of mitigating factors is not mandatory and rests within the discretion of the trial court, and the trial court is not required to accept the defendant's arguments as to what constitutes a mitigating factor." *Williams v. State*, 997 N.E.2d 1154, 1163 (Ind. Ct. App. 2013). "Further, the trial court is not required to give the same weight to proffered mitigating factors as the defendant does, nor is it obligated to explain why it did not find a factor to be significantly mitigating. *Id*. at 1163-64.

When a defendant alleges that the trial court failed to identify a mitigating circumstance, she is required to establish that the mitigator is both significant and clearly supported by the record. *Anglemyer v. State*, 868 N.E.2d 482, 493

(Ind. 2007), *modified on other grounds on reh'g*, 875 N.E.2d 218 (Ind. 2007). By her own admission, Thomas "had contact with the criminal justice system five (5) times."[4] *Appellant's Br.* at 27. In an attempt to downplay the significance of these contacts, Thomas argues that three of those contacts "were informal juvenile adjustments." *Id.* It was within the discretion of the trial court, however, to decide whether Thomas's history was a factor of mitigation or aggravation. Thomas has three prior adult misdemeanor convictions including minor consumption of alcohol, public intoxication, and battery. *Appellant's App. Vol. III* at 6. While serving her first adult sentence, Thomas violated the terms of her suspended sentence. *Id.* And while her prior alcohol-related convictions occurred fifteen years ago, those convictions and the testimony at sentencing show that she has not yet addressed a long-term problem of alcohol abuse. *Id.* at 4; *Tr. Vol. 3* at 38, 55. Thomas also has juvenile allegations for battery, leaving home, and possession of alcohol by a minor. *Appellant's App. Vol. III* at 4. Here, the trial court did not abuse its discretion when it found Thomas's criminal history was an aggravating factor.

[26] Likewise, it is within the trial court's discretion to decide whether alternative sentencing is warranted on the basis of a family support system. Defense counsel argued during sentencing that Thomas's mother provided her strong support and that this support warranted alternative sentencing. *Tr. Vol. 3* at 47,

---

[4] Thomas's CCS, however, reflects six contacts with the criminal justice system, three of which were committed when she was a juvenile. *Appellant's App. Vol. III* at 5-6.

53. Thomas previously violated a suspended sentence when she was provided the benefit of an alternative placement. *Appellant's App. Vol. III* at 6. While alternative placements may have been available, it was not clearly against the logic and effect of the facts and circumstances for the trial court to order Thomas to serve her sentence in the DOC.

## III. Inappropriateness of Sentence

[27] Finally, Thomas argues that her aggregate executed sentence of six years and 180 days is inappropriate. Pursuant to Indiana Appellate Rule 7(B), a sentence authorized by statute can be revised where it is inappropriate in light of the nature of the offense and the character of the offender. Under Appellate Rule 7(B) analysis, we do not determine "whether another sentence is more appropriate" but, rather, "whether the sentence imposed is inappropriate." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012) (quoting *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008)). "Sentence review under Appellate Rule 7(B) is very deferential to the trial court." *Id.* "The burden is on the defendant to persuade the appellate court that his sentence is inappropriate." *Id.* (citing *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)). "Therefore, when reviewing a sentence, our principal role is to 'leaven the outliers' rather than necessarily achieve what is perceived as the 'correct' result." *Id.* (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008)).

[28] We begin by noting that Thomas makes no claim that a 180-day sentence for her Class B misdemeanor is inappropriate. She also makes no claim that the

six-year advisory sentence is inappropriate for her attempted arson conviction. *Appellant's Br*. at 32. Instead, she claims that only three years of her six-year sentence should have been executed at the DOC, with the balance suspended to probation.

[29] "The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed." *Sanders*, 71 N.E.3d at 844. "We also assess the trial court's recognition or nonrecognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed was inappropriate." *Id*. "However, a defendant must persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review." *Id*. (alteration in original) (internal quotation marks omitted).

[30] Regarding the nature of the offense, B.R. had to call the police twice on the morning of October 2 to report trouble with Thomas. In their second response, the police decided that Thomas had attempted to commit arson at the house where her pregnant girlfriend lived with four children. Thomas had poured gasoline around the house, obtained a piece of dry paper on a rainy morning, and lit the paper in an effort to ignite a fire by the driveway-side entrance. Thomas was intoxicated during the arson incident and stated, "[I]f [she]had not drank [herself] into a complete altered state, [she] . . . would not be here today." *Tr. Vol. 3* at 55. However, Thomas had prior alcohol-related incidents and "a drinking problem" that she had not yet treated. *Id*. at 38, 51.

[31]     We recognize that Thomas had not been convicted of a crime since 2009; had been gainfully employed for almost ten years; and had expressed a desire to further her education. *Appellant's Br.* at 30. However, Thomas's criminal history is a negative reflection on her character. Thomas has had six separate encounters with the judicial system, three of which were convictions for minor consumption of alcohol, public intoxication, and battery. *Appellant's App. Vol. III* at 6. As the trial court noted, Thomas has been "given the benefit of short jail sentences, longer jail sentences, unsupervised probation, counseling at Addictive Behaviors, [and] counseling at the Center for Non Violence." *Tr. Vol. 3* at 57. Thomas had been revoked from a suspended sentence once and been given the benefit of home detention. *Id.* The trial court said, "You've been in treatment a couple of times and nothing seems to be working[.]" *Id.* Under these facts, we conclude that six years executed at the DOC for the attempted arson conviction was not inappropriate in light of the nature of the offense and the character of the offender. *Id.* Thomas's sentence of six years and 180 days executed was not inappropriate.

[32]     Affirmed.


Najam, J., and Brown, J., concur.