FILED

Sep 30 2020, 10:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Scott L. King
Lakeisha C. Murdaugh
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lavoyd D. Shepherd, *Appellant-Defendant,* | September 30, 2020 |
| v. | Court of Appeals Case No. 20A-CR-179 |
| | Appeal from the Lake Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Clarence D. Murray, Judge |
| | Trial Court Cause No. 45G02-1702-MR-3 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Lavoyd Shepherd (Shepherd), appeals his conviction and sentence following the jury's guilty verdicts for voluntary manslaughter, a Level 2 felony, Ind. Code § 35-42-1-3; aggravated battery, a Level 1 felony, I.C. § 35-42-2-1.5; battery resulting in death to a person less than fourteen years old, a Level 2 felony, I.C. §§ 35-42-2-1(c)(1), -(k)(1); and battery resulting in bodily injury to a person less than fourteen years old, a Level 5 felony, I.C. §§ 35-42-2-1(c)(1), -(g)(5)(B).

We affirm.

# ISSUES

Shepherd presents the court with six issues, which we restate as the following:

 (1) Whether the State proved beyond a reasonable doubt that it was he who injured A.F.;

 (2) Whether the trial court abused its discretion when it excluded the video-recorded police interview of a witness who testified at trial;

 (3) Whether the trial court committed reversible error by instructing the jury on voluntary manslaughter;

 (4) Whether the trial court abused its discretion by admitting photographic images seized from Shepherd's cell phone

pursuant to a search warrant after the return of the warrant
was delayed;

(5) Whether his sentence for aggravated battery violates
Indiana's Proportionality Clause; and

(6) Whether his sentence is inappropriate given the nature of the
aggravated battery offense and his character.

## FACTS AND PROCEDURAL HISTORY

[4] Andre Ferguson (Ferguson) and Lena Harper (Harper) were formerly in a
romantic relationship, and their daughter, A.F., was born on May 20, 2015.
Harper subsequently began a relationship with Shepherd, and Ferguson
exercised regular parenting-time with A.F. On February 20, 2017, Shepherd
drove with Harper and Shepherd's ten-year-old son, J.S., to a gas station in
South Holland, Illinois, to retrieve physical custody of A.F., who had spent the
three-day holiday weekend with Ferguson and his family. Ferguson had given
A.F. her favorite snack, pretzel sticks, prior to the drop-off at 9:30 p.m. and
allowed her to take the bag of pretzels with her. A.F. continued to eat pretzels
in Shepherd's SUV on the way back to his apartment in Merrillville, Indiana,
where Shepherd lived with Harper, A.F., and J.S. They arrived at Shepherd's
apartment at approximately 10:00 p.m. Shepherd consumed his favorite
alcoholic beverage, tequila, while the rest of the household's occupants went to
bed.

[5] A.F. and J.S. shared a bedroom in Shepherd's apartment. In the early morning hours of February 21, 2017, A.F. cried. Between 4:00 a.m. and 5:00 a.m., J.S. went to tell Shepherd, who was sleeping on the couch in the living room, that A.F. was crying. J.S. then went back to bed. Shepherd later awakened J.S. and told him that A.F. was not breathing. Shepherd attempted to perform CPR on A.F. in the living room, which awakened Harper. Shepherd and Harper drove A.F. to the hospital, and J.S. took the bus to school as he normally would. A.F. had no heartbeat and was essentially dead upon her arrival at the hospital. Despite the extensive efforts made to revive her, A.F. was pronounced dead at the hospital at 6:03 a.m. Shepherd subsequently left Harper at the hospital and was intercepted by police at J.S.'s school. While at school that morning, J.S. had written a short essay about the holiday weekend in which he stated that it had been good until that morning because that was when his little sister had died.

[6] An autopsy performed by Dr. Zhuo Wang (Dr. Wang) on February 22, 2017, revealed that A.F. had died of multiple blunt force traumas to her head and abdomen. The force of the trauma to A.F.'s head had caused the fibrous bands holding her skull together to separate and had injured her brain. The wounds to A.F.'s abdomen had caused massive internal bleeding. Either the injuries to A.F.'s head or to her abdomen would have been fatal.

[7] On February 21, 2017, investigators procured a search warrant for Shepherd's apartment. Photographs of A.F.'s and J.S.'s bedroom revealed a large tear in the netting of A.F.'s pack-and-play which served as her bed. Shepherd's cell

phone was collected from the living room couch. Shepherd provided statements to an investigator with the coroner's office, a Child Protective Services (CPS) assessor, and to the police. Although some of the details of his accounts varied among these statements, Shepherd consistently reported that he was the only one awake in the apartment. Although he had initially reported to Harper that he had stayed awake all night, according to Shepherd's later statements, he had stayed awake until around 4:00 a.m., and J.S. woke him around 5:00 a.m. to tell him that A.F. was making strange noises. Shepherd reported that he had found A.F. unresponsive and had shaken her in an attempt to revive her before performing CPR. Shepherd related in one of his police interviews that he felt that Harper told Ferguson too much about her relationship with Shepherd and that Harper had been on the phone with Ferguson for an hour on February 20, 2017. Because of the nature of A.F.'s injuries, investigators sought Harper's and Shepherd's consent to measure and photograph their hands. Harper immediately consented, but Shepherd refused. Shepherd's hands were later photographed and measured pursuant to a court order.

[8]     On February 21, 2017, and again on February 23, 2017, J.S. was interviewed by police and provided statements which were video recorded.[1] J.S. appeared to be calm and relaxed as the interviewer built rapport with him by asking him questions unrelated to the investigation. When the subject of the interview

---

[1] The video recording of J.S.'s second interview is not part of the record on appeal.

turned to the events surrounding A.F.'s death, J.S. became more physically animated, shaking his leg and changing positions in his seat. At various times during the interview, J.S. reported that he had awakened Shepherd at 10:22 p.m., 5:00 a.m., and 5:22 a.m. J.S. claimed to have performed CPR on A.F. but later in the interview admitted that he had not. Contrary to what he had written in his school essay, during the interview J.S. stated that he did not know what had happened to A.F. but that he wanted to assume that she was alright.

[9] Based on Shepherd's statements that everyone else in the apartment had been asleep, the amount of force required to inflict A.F.'s injuries, and the fact that J.S. was five feet tall and weighed seventy pounds at the time, investigators ruled out Harper and J.S. as suspects in A.F.'s death. On February 24, 2017, the State filed an Information, charging Shepherd with murder, aggravated battery, battery resulting in death to a person less than fourteen years old, and battery resulting in bodily injury to a person less than fourteen years old. Investigators sought and received a search warrant to procure the contents of Shepherd's cell phone. The lead investigator, Detective James Bogner (Detective Bogner) of the Merrillville Police Department, transported Shepherd's cell phone to the Indiana State Police post on April 4, 2017, where the search warrant was executed by Detective Alva Whited (Detective Whited). Detective Whited extracted seven images from Shepherd's cell phone showing what appeared to be an adult male's hand positioning A.F.'s mouth so that a severe tongue injury was visible from different angles. Metadata extracted with the images indicated that they were taken from 3:42:02 a.m. to 3:43:54 a.m. on

February 21, 2017, and that they were taken with Shepherd's cell phone camera, as opposed to being taken and sent to him by someone else. In his various statements to investigators, Shepherd had never mentioned discovering A.F.'s tongue injury or photographing it. On April 4, 2017, after Detective Whited finished his forensic examination, Detective Bogner retrieved Shepherd's cell phone and completed the return on the search warrant. However, the search warrant return was not immediately filed.

[10] On May 9, 2018, Shepherd filed a motion to suppress arguing that the seven images extracted from his cell phone should be excluded from the evidence because the State had failed to file the return on the search warrant. On August 16, 2018, and September 13, 2018, the trial court held hearings on Shepherd's motion to suppress. The State filed the search warrant return the day of the first hearing. In the return, Detective Bogner swore under penalties of perjury that he had taken Shepherd's cell phone to Detective Whited for examination on April 4, 2017; the cell phone was searched, and data was gathered; and that an inventory of the property taken under the search warrant was "[a]ll data collected from the phone via forensic means[.]" (Suppression Exh. Vol. p. 7). On November 16, 2018, the trial court denied Shepherd's motion to suppress.

[11] On August 12, 2019, the trial court convened Shepherd's five-day jury trial. Shepherd's theory of the case was that A.F. had sustained her fatal injuries either while she had been in the care of Ferguson and his family or at the hands of J.S. Ferguson and others who had cared for A.F. that weekend all testified that she had not had any falls or injuries and that she appeared to be normal

and healthy. J.S. testified and denied ever having hit or kicked A.F. J.S. confirmed that the netting on A.F.'s pack-and-play had not been torn before that night. J.S. was cross-examined by Shepherd regarding inconsistencies in his police statements and his trial testimony. After J.S. testified as part of the State's case-in-chief and had also been called by Shepherd as part of his own case, Shepherd sought to have the video recordings of J.S.'s police interviews admitted to "complete impeachment," to allow the jury to observe J.S.'s height and weight at the time, and to allow the jury to observe J.S.'s change in demeanor during his police interviews. (Transcript Vol. III, p. 144). The trial court ultimately excluded the video of J.S.'s interview, ruling that, due to J.S.'s acknowledgement of the inconsistencies in his statements and other testimony, the video recordings were cumulative. Detective Bogner testified and related to the jury that Harper had reported to him that Shepherd had asked her, "What are we going to say?" and that investigators were interested in knowing why he had asked her that. (Tr. Vol. III, p. 159).

[12] Dr. Wang testified that a great amount of force had been required to inflict A.F.'s injuries and that she had sustained her head and abdominal injuries close in time because either set of injuries would have been fatal. Dr. Wang had collected tissues from A.F.'s head and abdominal injuries which contained fresh red blood cells but no white blood cells. The presence of only red blood cells in the tissue samples indicated to Dr. Wang that A.F. had died within approximately two hours of sustaining her injuries. Dr. Wang had also noted a lack of blood in A.F.'s diaper, from which he concluded that she had died

quickly from her injuries, as there had not been adequate time for the blood in her abdominal cavity to pass out of her body. It was Dr. Wang's opinion that it was highly unlikely that someone with A.F.'s injuries would have been able to consume food.

[13]  During the final instruction conference, the trial court indicated that it would give the jury instructions on voluntary manslaughter and sudden heat. The State objected to the giving of these instructions, arguing that there was no evidence to support them. Shepherd's counsel argued in support of giving the instructions that "[y]ou could have an inference from the lateness of the hour, the crying baby, disturbance of the sleep, that would be the evidence . . . ." (Tr. Vol. IV, p. 33). The trial court noted that there had been evidence presented that Shepherd was upset about Harper and Ferguson talking earlier that day. The trial court ruled that it would give the voluntary manslaughter instructions, and Shepherd did not object. The jury found Shepherd guilty of voluntary manslaughter and all the battery charges. At the State's request, the trial court immediately entered judgment of conviction for voluntary manslaughter.

[14]  On August 19, 2019, the trial court entered judgment of conviction for Level 1 felony aggravated battery and took entry of judgment on the other verdicts under advisement. On September 11, 2019, Shepherd's presentence investigation report was filed and revealed the following. Shepherd had no juvenile record or adult criminal convictions, but he had a pending Level 6 felony domestic battery charge at the time of A.F.'s death. Shepherd began

consuming alcohol and marijuana at the age of thirteen and has consumed marijuana daily since he was eighteen years old.

[15]  On December 4, 2019, the trial court held Shepherd's sentencing hearing. Based on double jeopardy concerns, the trial court vacated the voluntary manslaughter conviction and "merge[d]" the other batteries into Shepherd's Level 1 felony aggravated battery, leaving only that conviction for sentencing. (Tr. Vol. V, p. 17). The trial court found as aggravating circumstances that the injuries Shepherd inflicted on A.F. were greater than necessary to accomplish the offense; Shepherd was on pretrial release in his domestic violence case when he committed the instant offense; the nature and circumstances of the offense were heinous, as Shepherd brutally beat A.F. as she slept; and that Shepherd was in a position of trust with A.F. As mitigating circumstances, the trial court found that Shepherd had no history of true-findings or criminal convictions and that his imprisonment would result in undue hardship to his other dependents. The trial court found that the aggravating circumstances outweighed the mitigating ones and sentenced Shepherd to thirty-five years, with five years suspended to probation.

[16]  Shepherd now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Sufficiency of the Evidence*

### A. *Standard of Review*

[17] Shepherd challenges the evidence supporting his conviction. More specifically, he contends that the State failed to prove beyond a reasonable doubt that it was he who inflicted A.F.'s injuries. The standard of review of such claims is well-settled: When we review the sufficiency of the evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is not our role as an appellate court to assess witness credibility or to weigh the evidence. *Id.* We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.*

### B. *Identity*

[18] In order to prove that a particular defendant committed an offense, it has long been held that "the proof of a mere opportunity to commit the crime, without more, is not sufficient to sustain a conviction." *Durham v. State*, 238 N.E.2d 9, 13 (Ind. 1968) (reversing defendant's assault and battery with intent to kill conviction where, apart from evidence she had the opportunity to strike her husband, there was "no other evidence in the entire record which even tends to establish that appellant struck such a blow[.]"). However, the identity of the perpetrator of an offense may be established solely by circumstantial evidence. *Bustamante v. State*, 557 N.E.2d 1313, 1317 (Ind. 1990). "The key question . . . is whether from all the evidence the jury could have drawn a reasonable

inference that appellant was the perpetrator of the crime." *Hovis v. State*, 455 N.E.2d 577, 579 (Ind. 1983).

[19] Shepherd argues that "[w]hen the evidence in this case is considered as a whole, the only reasonable inference that a trier of fact could draw is that while it was *possible* that [Shepherd] committed the crimes," the State only established that he had the opportunity to commit the offenses. (Appellant's Br. p. 24) (emphasis in original). We disagree. A.F. had been in the care of Ferguson and his family over the three-day weekend, but no one observed any severe injuries to her when custody was exchanged back to Harper at around 9:30 p.m. on February 20, 2017. A.F. ate pretzels on the way back to Shepherd's apartment. Dr. Wang testified that it was highly unlikely that anyone with A.F.'s injuries would have been able to eat and that A.F. had died within approximately two hours of sustaining her injuries. A.F. awakened J.S. with crying between 4:00 a.m. and 5:00 a.m., establishing that she was still alive during that timeframe. Given that A.F. was able to eat after leaving Ferguson's custody and continued to live approximately six hours thereafter, the jury could reasonably infer that A.F. did not sustain her injuries while with Ferguson and his family over the long weekend.

[20] Other evidence allowed the jury to infer that it was Shepherd, as opposed to J.S. or Harper, who inflicted A.F.'s fatal injuries. According to Shepherd's own statements, Harper was asleep until she was awakened by the commotion of Shepherd attempting to revive A.F. J.S. denied ever having hit or kicked A.F. J.S. testified that he woke Shepherd because A.F. was making noise, indicating

A.F. was still alive at that point. Shepherd later woke J.S. to tell him that A.F. was no longer breathing, all of which supports an inference that A.F. became unresponsive while Shepherd was the only one awake and out of bed. In addition, Shepherd used his cell phone just before 4:00 a.m. to capture images of a serious injury to A.F.'s tongue, but he did not mention that he had discovered the injury or photographed it when speaking to the deputy coroner, the CPS assessor, or in his interviews with police, which supported an inference that Shepherd attempted to conceal his guilt. Shepherd also asked Harper what they were going to say about A.F., from which the jury could reasonably infer that Shepherd was also attempting to conceal his guilt by fabricating a version of events which did not include him inflicting serious injury on A.F. The totality of this evidence showed much more than Shepherd having a mere opportunity to injure A.F.; rather, it supported the jury's reasonable conclusion that it was, indeed, Shepherd who inflicted A.F.'s fatal injuries.

[21] Despite the evidence supporting the jury's verdict, Shepherd directs our attention to portions of Dr. Wang's testimony which he argues showed that A.F.'s injuries could have been inflicted up to forty-eight hours before her death, casting a reasonable doubt on his identity as the perpetrator. Shepherd also points to Dr. Wang's testimony that the contents of A.F.'s stomach showed that she had died within two hours of having last eaten. However, Shepherd's argument ignores Dr. Wang's testimony that A.F. incurred all her injuries close in time and that she died within approximately two hours of having sustained those injuries, a conclusion he based in part on the lack of

white blood cells in her tissue samples. Shepherd's argument based on Dr. Wang's other testimony is unpersuasive in that it requires us to consider evidence that does not support the jury's verdict, in contravention of our standard of review. *Drane*, 867 N.E.2d at 146.

[22] Shepherd also directs our attention to evidence that A.F. vomited during the car ride home which he contends could have could been a symptom of injury, his report that A.F. was fine when he claimed to have checked on her around 12:30 a.m., what he implies were suspicious inconsistencies in J.S.'s reports of the events, the fact that A.F. appeared to still be alive in the images of her that were taken just before 4:00 a.m., and other evidence he contends supported a reasonable inference that it was not he who injured A.F. However, all these facts and arguments were presented to the jury, but the jury chose to believe the other evidence supporting Shepherd's guilt. As a court of review, we are obligated to leave the jury's verdict intact because there was sufficient evidence of probative value to support it. *See id*.

## II. *Exclusion of J.S.'s Video-Recorded Police Interviews*

### A. *Standard of Review*

[23] Shepherd sought to have J.S.'s video-recorded police interviews admitted during the State's case-in-chief and during the presentation of his own case. Shepherd contends that the trial court violated his rights to confrontation and cross-examination by excluding this evidence. A trial court has inherent discretionary power regarding the admission of evidence, and we review its decisions only for an abuse of that discretion. *Vasquez v. State*, 868 N.E.2d 473,

476 (Ind. 2007). To reverse a trial court's decision to exclude evidence, there must be error by the court that affects the defendant's substantial rights. *Id.*

## B. *Right to Cross-Examine*

[24] Shepherd argues that the trial court impermissibly limited his right to cross-examine and impeach J.S. by excluding his police interviews. Although he offered multiple arguments for admissibility below, to us he only argues that he had the right to present "relevant evidence of J.S.'s demeanor in his videotaped interviews to assist [the jury] in assessing J.S.'s credibility in his denial of physical contact with A.F., contact that may have resulted in the fatal injuries that led to her death." (Appellant's Br. p. 29). In addressing this claim, we begin by observing that a criminal defendant's right to confront and cross-examine witnesses is guaranteed by the Sixth Amendment and Indiana's Constitution, and it is "'one of the fundamental rights of our criminal justice system.'" *Hubbell v. State*, 754 N.E.2d 884, 891 (Ind. 2001) (quoting *Pigg v. State*, 603 N.E.2d 154, 155 (Ind. 1992)). However, it is also well-established that the right of a criminal defendant to cross-examine witnesses against him is not absolute and is subject to reasonable limitations at the discretion of the trial court. *Logan v. State*, 729 N.E.2d 125, 134 (Ind. 2000).

[25] Indiana Evidence Rule 613(a) provides that a witness may be examined about a prior statement. However, a prior inconsistent statement is not admissible under Rule 613 if the witness has already acknowledged the prior inconsistent statement on cross-examination because impeachment is complete after such an acknowledgment. *Dixon v. State*, 967 N.E.2d 1090, 1092 (Ind. Ct. App. 2012);

*see also D'Paffo v. State*, 749 N.E.2d 1235, 1240 (Ind. Ct. App. 2001) (holding that exclusion of evidence of molestation victims' prior inconsistent statements was within the trial court's discretion where victims had already acknowledged the inconsistencies on cross-examination), *vacated in part on other grounds*; *Roberts v. State*, 712 N.E.2d 23, 32 (Ind. Ct. App. 1999) (finding no abuse of the trial court's discretion in excluding rape victim's videotaped interview denying she had had intercourse with Roberts where she admitted making those statements on cross-examination), *trans. denied*.

[26] Here, Shepherd confronted J.S. on cross and direct examination with J.S.'s prior statements about the differing times J.S. gave for waking Shepherd, what J.S. knew about A.F.'s condition when he wrote the short school essay, and his initial false claim that he had performed CPR on A.F. J.S. acknowledged having made inconsistent statements on these and other topics and offered explanations for why he had done so. Therefore, impeachment was complete, and the trial court did not abuse its discretion in excluding J.S.'s videotaped interview for impeachment purposes under the Trial Rules. *See id*.

[27] Our supreme court has observed that, at times, the evidentiary rules must yield to a defendant's right to cross-examine the witnesses against him. *State v. Walton*, 715 N.E.2d 824, 827 (Ind. 1999). However, it is equally true that the Confrontation Clause only guarantees an opportunity for effective cross-examination; it does not guarantee cross-examination in whatever manner or extent desired by a defendant. *Fowler v. State*, 829 N.E.2d 459, 469 (Ind. 2005). We cannot say that Shepherd was denied his right to cross-examine J.S. when

the trial court prevented him from showing the jury J.S.'s demeanor through publication of the video recordings of the interviews. First and foremost, J.S. testified at trial and was subject to extensive cross-examination and direct questioning by Shepherd about his prior statements and other matters, so the jury had a first-hand opportunity to assess J.S.'s credibility as a witness in open court. Shepherd explicitly questioned J.S. about why his demeanor had changed between the rapport-building and substantive portions of the interviews. J.S. explained that he moves his body when he is nervous and that he was nervous when he spoke to the police. In addition, when Shepherd called J.S. as a witness during his own case, the trial court allowed Shepherd to play a small portion of J.S.'s first interview with police in an effort to refresh his memory on a matter, so the jury did, in fact, have a short opportunity to view his demeanor during that interview. We would also note that, because this short portion of J.S.'s first interview was played before the jury, it also had an opportunity to assess J.S.'s physical size at the time of the events, another basis for admission Shepherd argued to the trial court.

[28] Shepherd also alludes to "due process" in this section of his argument, but he does not develop any independent argument on that claim. (Appellant's Br. pp. 27, 29). Indiana Appellate Rule (A)(8)(a) provides that appellate arguments must be supported by citation to legal authority and cogent reasoning. Failure to do so results in waiver of an issue for our consideration. *Griffith v. State*, 59 N.E.3d 947, 958 n.5 (Ind. 2016). We conclude that Shepherd has waived his due process argument and do not address it. Because the video recordings of

J.S.'s police interviews were inadmissible under the Trial Rules and Shepherd had an opportunity to effectively cross-examine J.S., we conclude that his right to confrontation and cross-examination was not infringed and the trial court did not abuse its discretion in excluding the proffered evidence.

### III. *Voluntary Manslaughter Instruction*

Shepherd next claims that the trial court "committed fundamental error when it gave the voluntary manslaughter instruction in the absence of sudden heat." (Appellant's Br. p. 30). However, although the jury found Shepherd guilty of voluntary manslaughter, prior to rendering sentence, the trial court vacated that conviction. "Mootness arises when the primary issue within the case has been ended or settled or in some manner disposed of, so as to render it unnecessary to decide the question involved." *C.J. v. State*, 74 N.E.3d 572, 575 (Ind. Ct. App. 2017) (quotation omitted), *trans. denied*. Put another way, when a court is not able to render effective relief to a party, the case is deemed moot and subject to dismissal. *Id.* Here, because the trial court vacated Shepherd's voluntary manslaughter conviction, there is nothing upon which we may render relief. We conclude that Shepherd's claim based upon the trial court's giving of the voluntary manslaughter instruction is moot, and we decline to address it.

### IV. *Admission of Images from Shepherd's Cell Phone*

Shepherd contends that the trial court abused its discretion in admitting the seven photographs of A.F.'s tongue injury procured from the execution of the search warrant for his cell phone because the return of the search warrant was defective. We review a trial court's decision to admit photographic evidence for

an abuse of discretion. *Ward v. State*, 903 N.E.2d 946, 958 (Ind. 2009). An abuse of discretion occurs when the trial court's evidentiary ruling is clearly against the logic and effect of the facts and circumstances before it. *Glasgow v. State*, 99 N.E.3d 251, 256 (Ind. Ct. App. 2018).

[31]   Indiana Code section 35-33-5-4(1) requires the officer who executes a search warrant to make a return of the warrant indicating the date and time the warrant was served and listing the items seized. The statute does not require that the return be filed within any specific period of time. *Id.*; *Webster v. State*, 579 N.E.2d 667, 670 (Ind. Ct. App. 1991). We will not find reversible error in the admission of evidence where the manner of the return was defective unless the defendant has demonstrated that he was prejudiced. *See Owens v. State*, 659 N.E.2d 466, 478 (Ind. 1995) (upholding the admission of evidence where no return was ever filed because Owens had not shown that he was prejudiced from the failure to file).

[32]   Here, Detective Bogner filled out the return of the search warrant on Shepherd's cell phone on April 4, 2017, the same day that the warrant was executed on the cell phone by Detective Whited. The return on the search warrant was not filed with the trial court until August 16, 2018, the day of the first hearing on Shepherd's motion to suppress. The return indicates that the search warrant was "received" on April 4, 2017, at 2:40 p.m., although Detective Bogner indicated at the hearings on the motion to suppress that was the date and time that the search warrant was executed. (Supp. Exh. Vol. p. 7). The return provides that data was seized pursuant to the search warrant.

[33]     Shepherd argues that the return was defective because it was not returned to the judicial officer who issued the search warrant, it was not filed until the day of the first suppression hearing, the return does not specify when the warrant was executed, and Detective Bogner signed the return electronically.  Apart from the failure to accurately word the date and time of the execution of the warrant, these allegations do not present true defects in the return, as the statute provides that the return may be filed with the "court or judge" who issued the warrant, the statute does not specify a time limit for the return of the warrant, and nothing in the statute precludes the use of an electronic signature.  *See* I.C. § 35-33-5-4.

[34]     More importantly, Shepherd has failed to demonstrate that he was prejudiced by any defects in the warrant itself or by the State's failure to file it until the suppression hearing.  Shepherd claims that he was prejudiced because the return failed to articulate how the data was extracted, copied, or stored upon execution of the warrant.  This is not a valid claim of prejudice because the search warrant return statute does not require that information to be included in the return.  *See id*.  Shepherd also claims that the failure to file the return constituted a "failure to provide sufficient information in [a] timely fashion so as to permit the defense to adequately examine and challenge the evidence obtained via such a faulty process." (Appellant's Br. p. 37).  However, on August 16, 2018, the day of the first suppression hearing and the filing of the return, the State filed a supplemental discovery response and served Shepherd with a copy of Detective Whited's report detailing the methods used to extract

the data and what was extracted. Shepherd's trial did not commence until August 12, 2019. Shepherd did not object at trial that the substance or manner of the search warrant's return prevented him from adequately researching and challenging the cell phone evidence between the suppression hearing and his trial. Thus, Shepherd has failed to persuade us that he was prejudiced by the filing of the return, and we find no abuse of the trial court's discretion in admitting the images procured pursuant to the search warrant issued for the contents of Shepherd's cell phone. *See Owens*, 659 N.E.2d at 478.

### IV. *Proportionality of Sentence*

[35] Shepherd next argues that the trial court's decision to vacate his voluntary manslaughter conviction and sentence him only for Level 1 felony aggravated battery violated the Proportionality Clause of the Indiana Constitution which provides that "[a]ll penalties shall be proportioned to the nature of the offense." Ind. Const. art. I, § 16. The Legislature has the exclusive authority to define crimes and establish penalties. *Brantley v. State*, 91 N.E.3d 566, 571 (Ind. 2018). In light of this exclusive authority, when addressing challenges based on the Proportionality Clause, separation-of-powers principles mandates that we afford substantial deference to the sanction chosen by the Legislature. *Mann v. State*, 895 N.E.2d 119, 122 (Ind. Ct. App. 2008). Therefore, "[w]e will not disturb the legislative determination of the appropriate penalty for criminal behavior except upon a showing of clear constitutional infirmity." *State v. Moss-Dwyer*, 686 N.E.2d 109, 111-12 (Ind. 1997). The penalty for an offense set by the Legislature is not unconstitutional under the Proportionality Clause unless

"it is so severe and entirely out of proportion to the gravity of the offense committed as to shock public sentiment and violate the judgment of reasonable people." *Murrell v. State*, 960 N.E.2d 854, 858 (Ind. Ct. App. 2012).

[36] Shepherd's argument is based upon a comparison of the voluntary manslaughter and aggravated battery statutes, so it is necessary to set out the elements of those offenses and their penalties. A person commits Level 2 felony voluntary manslaughter when he intentionally or knowingly kills another human being while acting under sudden heat. I.C. § 35-42-1-3(a). Sudden heat is a mitigating factor that reduces an offense that otherwise would be murder. I.C. § 35-42-1-3(b). 'Sudden heat' is characterized as "anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection." *Dearman v. State*, 743 N.E.2d 757, 760 (Ind. 2001). The essence of the offense of voluntary manslaughter is that an impetus to kill suddenly overwhelms a defendant. *Stevens v. State*, 691 N.E.2d 412, 427 (Ind. 1997). As for Level 1 felony aggravated battery, it is committed when a person intentionally or knowingly inflicts injury on a person that creates a substantial risk of death and results in the death of a child less than fourteen years of age. I.C. § 35-42-2-1.5. The maximum sentence for a Level 2 felony is thirty years, while the maximum sentence for a Level 1 felony is forty years. *Compare* I.C. § 35-50-2-4.5 *with* I.C. § 35-50-2-4(b).

[37] Shepherd argues that his thirty-five-year sentence for aggravated battery results in an anomaly in that "the same acts supporting a conviction for a knowing or

intentional killing are more substantially punished as a knowing or intentional act of inflicting injury, [*i.e.*] without the intent to kill." (Appellant's Br. p. 39). However, the presence of sudden heat mitigates the offense of murder precisely because it interferes with knowing or intentional action. *See Dearman*, 743 N.E.2d at 760. Our Legislature could have rationally chosen to impose a more severe punishment where knowing and intentional action results in death (Level 1 felony aggravated battery) than where death has resulted when action was not fully knowing and intentional because of sudden heat (voluntary manslaughter). Accordingly, we find no violation of Indiana's Proportionality Clause.

[38] In this section of his argument, Shepherd also argues that his sentencing for aggravated battery violated his due process rights because he was deprived of the benefit of the jury's finding that he had acted in sudden heat. Shepherd cites no legal authority for his proposition, and we are aware of none. The trial court vacated Shepherd's voluntary manslaughter conviction due to double jeopardy concerns. Shepherd acknowledges that his dual convictions for voluntary manslaughter and aggravated battery could not stand. When faced with dual convictions that offend double jeopardy principles, our supreme court has remedied that violation by vacating the offense that carried the lesser criminal penalty. *See Jenkins v. State*, 726 N.E.2d 268, 271 (Ind. 2000) (vacating Jenkins' robbery conviction instead of his felony murder conviction); *see also Wadle v. State*, — N.E.3d —, 2020 WL 4782698, *18 (Ind. Aug. 18, 2020) (vacating Wadle's Level 5 felony OWI-SBI conviction while leaving in place his Level 3 felony conviction for leaving the scene). Therefore, we find no error on

the part of the trial court in vacating Shepherd's Level 2 felony voluntary manslaughter conviction.

## V. *Inappropriateness of Sentence*

[39] Shepherd also requests that we review the appropriateness of his thirty-five-year sentence. "Even when a trial court imposes a sentence within its discretion, the Indiana Constitution authorizes independent appellate review and revision of this sentencing decision." *Hoak v. State*, 113 N.E.3d 1209, 1209 (Ind. 2019). Thus, we may revise a sentence if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offenses and the character of the offender. *Id.* The principal role of such review is to attempt to leaven the outliers. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). The defendant bears the burden to persuade the reviewing court that the sentence imposed is inappropriate. *Robinson v. State*, 91 N.E.3d 574, 577 (Ind. 2018).

### A. *Nature of the Offense*

[40] When assessing the nature of an offense, the advisory sentence is the starting point that the legislature selected as an appropriate sentence for the particular crime committed. *Perry v. State*, 78 N.E.3d 1, 13 (Ind. Ct. App. 2017). The trial court entered judgment of conviction and sentenced Shepherd only for his Level 1 felony aggravated battery conviction. A Level 1 felony has a minimum sentence of twenty years and a maximum sentence of forty years, with an advisory sentence of thirty years. I.C. § 35-50-2-4(b). The trial court imposed a

moderately-enhanced sentence of thirty-five years and suspended five years to probation.

[41] When reviewing the nature of the offense, we look to the "the details and circumstances of the commission of the offense and the defendant's participation." *Perry*, 78 N.E.3d at 13. Shepherd maintains his innocence and, therefore, does not offer any argument that his sentence was inappropriate in light of the nature of his offense. However, Shepherd was found guilty by the jury of the offense of aggravated battery, and we have concluded that the State proved the offense beyond a reasonable doubt. Aggravated battery is a Level 1 felony if it results in the death of a person less than fourteen years old. I.C. § 35-42-2-1.5. A.F. was less than two years old when she died, so the age of the victim in this case was much younger than that necessary to prove the offense, rendering Shepherd's offense more egregious. As Harper's partner and A.F.'s caretaker, Shepherd was in a position of trust with A.F. Instead of protecting A.F. during the early hours of February 21, 2017, Shepherd drank tequila and beat A.F. to death. There is evidence in the record suggesting that Shepherd was upset that day that Harper had a continuing relationship with A.F.'s father and that A.F. had been crying. The injuries Shepherd inflicted to A.F.'s head were so forceful that they caused the sections of her skull to separate and penetrated to her brain. The injuries Shepherd inflicted to A.F.'s abdomen caused massive internal bleeding that shut down her organs. Either of these sets of injuries would have been enough to cause A.F.'s death, so the harm that Shepherd caused to A.F. was far greater than that necessary to prove the

offense, which also makes his offense more egregious. All of this occurred within ten-year-old J.S.'s hearing. In short, we find nothing about the nature of Shepherd's offense which renders the moderately-enhanced sentence imposed here inappropriate.

### B. *Character of the Offender*

[42] Shepherd urges us to revise his sentence in light of his character. Upon reviewing a sentence for inappropriateness, we look to a defendant's life and conduct as illustrative of his character. *Morris v. State*, 114 N.E.3d 531, 539 (Ind. Ct. App. 2018), *trans. denied*. Shepherd directs our attention to his lack of criminal record prior to the instant offenses, his positive relationships with his own six children and others, and his employment record. However, we find the fact that Shepherd was on pre-trial release on a charge of Level 6 felony domestic battery against the mother of one of his children at the time he committed the instant offense, evidence in the record that Shepherd attempted to procure Harper's cooperation in fashioning a version of events favorable to him, and his daily marijuana use prevent us from adjusting his sentence based on his lack of a criminal record. In addition, after severely beating A.F., Shepherd knew at the very least that he had inflicted serious injuries to A.F.'s tongue, yet instead of seeking assistance for her, he took photographs of her injuries and went to sleep. We find this to be more illustrative of Shepherd's character than the sentencing testimony and materials offered to the trial court by his friends and family or the two jobs he listed in his presentence

investigation report. Accordingly, we decline to revise Shepherd's sentence in light of his character.

# CONCLUSION

[43] Based on the foregoing, we conclude that the State proved beyond a reasonable doubt that Shepherd inflicted A.F.'s injuries; the trial court did not abuse its discretion in excluding J.S.'s video-recorded interviews; Shepherd's instructional claim is moot; the trial court acted within its discretion in admitting the images seized from Shepherd's cell phone; Shepherd's sentence does not violate Indiana's Proportionality Clause; and Shepherd's sentence is not inappropriate.

[44] Affirmed.

[45] May, J. and Altice, J. concur